06 - 20592

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CIV-UNGARO-BENAGES

MAGISTRATE JUDGE
O'SULLIVAN

CHICKEN KITCHEN USA, LLC,
a Florida limited liability company,

    Case No.

        Plaintiffs,

v.

MANRESA CORPORATION,
A Florida corporation, and
FRANK BEGUIRISTAIN,

        Defendants.



_____/

## COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

    Plaintiff, CHICKEN KITCHEN USA, LLC ("Chicken Kitchen" and/or "Plaintiff"), by and through its undersigned attorneys, files its complaint for injunctive and other relief against defendants, MANRESA CORPORATION ("Manresa") and FRANK BEGUIRISTAIN ("Beguiristain") (collectively, Manresa and Berguirstain shall be referred to herein as "Defendants"), and states as follows:

### PARTIES

    1.    Plaintiff, Chicken Kitchen, is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in North Miami, Florida.

1

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

2.      Defendant, Manresa, is a citizen of the State of Florida, being a corporation organized and existing under the laws of the State of Florida with its principal place of business in North Miami, Florida.

3.      Defendant, Beguiristain, is a citizen and resident of the State of Florida, is sui juris, and is a shareholder, officer and/or director of Manresa.

## JURISDICTION AND VENUE

4.      The Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338, and the doctrine of supplemental jurisdiction.  The Court also has jurisdiction under 28 U.S.C. § 1332(a) in that this is a civil action between the parties and pursuant to Article XXIV of the annexed Franchise Agreement, the parties agreed that the US District Court for the Southern District of Florida shall be the proper venue and forum to adjudicate any dispute under such franchise agreement.

5.      Venue in this action is properly placed in this judicial district pursuant to 28 U.S.C. § 1391 because all Defendants reside in Florida and one or more of the Defendants reside in this district, and because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## FACTS COMMON TO ALL COUNTS

6.      Chicken Kitchen has developed specialty restaurants known as Chicken Kitchen Restaurants, which feature a variety of grilled chicken product line items, salads

2
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

and related food and drink products and operate with a unique and uniform business format, specially designed equipment, methods, procedures and designs.

7.      Chicken Kitchen grants franchises to qualified persons to own and operate Chicken Kitchen restaurants employing Chicken Kitchen's unique system, including special marketing and advertising methods, uniform business format, recipes, equipment, procedures, designs, signage, décor, training programs and other services as set forth in the franchise agreement ("the System").

8.      The System has been used by Chicken Kitchen and its franchisees in connection with the operation of Chicken Kitchen restaurants throughout the United States.

9.      Chicken Kitchen is the authorized exclusive licensee of the trademark owner, CK Systems, Inc., of the trademarks set forth below (the "Marks").  Chicken Kitchen has obtained the exclusive right to use, promote and license the Marks in connection with the operation of Chicken Kitchen restaurants in the entire USA, including the state of Florida.  The Marks are registered with the Principal Register of the United States Patent and Trademark Office, and all necessary affidavits of use have been filed:

CHICKEN KITCHEN
Registration No.: 1,802,400
Registration Date: November 2, 1993

Stylized CHICKEN Design
Registration No.: 1,754,370
Registration Date: February 23, 1993

3

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

**CHOP-CHOP**
Registration No.: 2,221,737
Registration Date: February 2, 1999

**CHICK-MOBILE**
Registration No.: 2,666,419
Registration Date: December 24, 2002



Registration No. 2,666,371
Registration Date: December 24, 2002

10.    For more than twenty years, Chicken Kitchen (or its predecessors) has been granting to its franchisees a limited license to use the Marks in connection with the System and the operation of Chicken Kitchen restaurants throughout the United States, including the State of Florida.

11.    Chicken Kitchen and its franchisees have extensively promoted and advertised the services and operations of Chicken Kitchen restaurants and the Marks through various media, and the Chicken Kitchen restaurants have met with widespread public approval.  The System, as well as the quality and service associated with Chicken Kitchen restaurants, have established demand and goodwill among customers in various parts of the United States, and the Marks, in addition to being arbitrary or suggestive, have acquired secondary meaning.

4

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

12.     On or about January 30, 2002, Manresa entered into a franchise agreement with Royal Oak Capital, LLC (the "Franchise Agreement"), which Franchise Agreement was assigned to Chicken Kitchen (the "Assignment") for the operation of a Chicken Kitchen restaurant located at Keystone Plaza, 13507 Biscayne Boulevard, North Miami, FL 33181 (the "Franchise Agreement").   True and correct copies of the Franchise Agreement and Assignment are attached hereto as Exhibits "A" and "B," respectively. Thereafter, Manresa opened and operated a Chicken Kitchen restaurant pursuant to the Franchise Agreement at Keystone Plaza, 13507 Biscayne Boulevard, North Miami, FL 33181 (the "Location").

13.     Pursuant to paragraph IV of the Franchise Agreement, Manresa agreed to pay to Chicken Kitchen, on a weekly basis for so long as the Franchise Agreement remained in effect, an amount equal to five percent (5%) of the weekly gross sales derived from the operation of the franchised businesses as a continuing franchise fee.  In addition, Manresa agreed to repay, as a percentage of weekly gross sales, a .75% Advertising Fund Fee, a 2% Advertising Cooperative Fee, and a 1.5% Local Advertising Fee.

14.     Pursuant to paragraph XVI of the Franchise Agreement, Defendants agreed to cease all use of the Chicken Kitchen Marks upon termination of the Franchise Agreement as a result of a default in their obligations under the Franchise Agreement.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

15.     Article XVI of the Franchise Agreement provides, in relevant part as follows, with respect to post-termination restrictions on Defendants' right to compete with Chicken Kitchen:

### *"XVI. OBLIGATIONS UPON TERMINATION OR EXPIRATION*

*Upon termination or expiration of this Agreement, all rights granted to Franchisee shall terminate and:*

*A.      Franchisee shall immediately cease to operate the Franchise Business, and shall not thereafter, directly or indirectly, represent to the public that the restaurant is associated with the Chicken Kitchen System or hold himself out as a present or former franchisee of Franchisor.*

*B.      Franchisee shall immediately and permanently cease to use, in any manner, any menus, recipes, confidential methods, procedures and techniques associated with the Chicken Kitchen System and the Proprietary Marks.  In particular, Franchisee shall cease to use, without limitation, the proprietary marinated chicken or marinade mix, and all signs, advertising materials, displays, stationery, forms and any other materials which display any of the Proprietary Marks; provided, however, that this Section XV.B. shall not apply to the operation by Franchisee of any other restaurant under the Chicken Kitchen System pursuant to a franchise granted by Franchisor to Franchisee.*

*E.      Franchisee shall take appropriate action to cancel any assumed or fictitious name registration, which contains any of the Proprietary Marks, and Franchisee shall furnish Franchisor with evidence of compliance within 30 days after termination or expiration of this Agreement.*

*F.      Franchisee shall, at Franchisor's option, assign to Franchisor or its designee Franchisee's interest in any lease or sublease for the premises of the Franchise Business.  If Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Franchise Business, Franchisee shall promptly after termination or expiration of this Agreement, make such modifications or alterations to the premises as may be necessary to distinguish the appearance of the premises from its former appearance and that of other restaurants operating under the Chicken Kitchen System.  If Franchisee fails or refuses to comply with the requirements of this Section XVI, Franchisor may enter upon the premises, without being guilty of trespass or any*

6

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

*other tort, for the purpose of making or causing to be made the required changes, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.*

*G.   Franchisee agrees, in the event it continues to operate or subsequently begins to operate a restaurant or other business, not to use any reproduction, counterfeit, copy, or colorable imitation of any of the Proprietary Marks in connection with the operation of, or promotion of, such restaurant or other business which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any trade dress designation of origin, description or representation which falsely suggests or represents an association or connection with Franchisor or the Chicken Kitchen System.*

*H.   Franchisee shall immediately pay all sums owing to Franchisor and its subsidiaries and affiliates.  In the event of termination because of a default by Franchisee, these sums shall include all damages, costs and expenses, including reasonable attorneys fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against all personal property, furnishings, equipment, signs, fixtures and inventory owned by Franchisee located on the premises of the Franchise Business at the time of default.*

*I.   Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provision of this Section XVI.*

*J.   Franchisee shall immediately deliver to Franchisor the MOP and such other records, files, instructions, correspondence and materials, which are confidential and are related to operating the Franchise Business and/or to the Chicken Kitchen System.*

*K.   Franchisor shall have the option, exercisable within 30 days after termination or expiration, to purchase from Franchisee the furnishings, equipment, signs, fixtures, supplies, inventory and other tangible assets of the Franchise Business at fair market value.  If the parties are unable to agree on the fair market value within a reasonable time, an independent appraiser shall be designated by Franchisor, which appraiser's determination shall be binding. Franchisor shall receive a credit against the purchase price for any sums,*

7

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

*which are owed to it or a subsidiary or affiliate by Franchisee, the cost of the appraisal, if any, and for any monies, which Franchisor expends for obligations of Franchisee. Upon payment of the purchase price, Franchisee shall deliver to Franchisor or its designee a bill of sale conveying title to the property free and clear of all encumbrances, and such other documents reasonably required to effect a complete transfer of Franchisee's right, title, and interest in the assets. Franchisee shall ensure that notice is given to all creditors pursuant to the applicable bulk transfer laws of the state where the Franchise Business was located, and shall hold Franchisor harmless from any and all claims of Franchisee's creditors.*

*L.      If Franchisee occupies the premises as a fee owner, Franchisee shall give Franchisor the option of buying or leasing the premises at its fair market value. In the event that Franchisor chooses to lease the premises, the term of the lease shall be for a period of 20 years.*

*M.      Franchisee shall comply with the covenants contained in Section XVII.C.*

16.      Beginning on approximately July 23, 2005, Defendants ceased paying continuing franchise fees and advertising fees to Chicken Kitchen on gross sales generated at the Location, except for payments received on January 4, 2006 and January 19, 2006, paid after Defendants default/termination, which amounts have been credited to Defendants' account.

17.      By letter dated November 21, 2005, Chicken Kitchen notified Defendants (the "Notice") that they were in default of their obligations under the Franchise Agreement for failing to pay continuing franchise fees and advertising fees. Pursuant to the Franchise Agreement, the Notice provided that if Defendants did not cure their defaults within ten (10) days, Chicken Kitchen had the right to terminate the Franchise

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

Agreement.  A subsequent email (the "Email") corrected an error in that the cure period was thirty (30) days and the default notice was amended and the time period was extended.  A true and correct copy of the Notice sent to the Defendants attached hereto as Exhibits "C".  Defendants failed to timely cure the default.

18.    By letter dated January 9, 2006, Chicken Kitchen notified Defendants that due to the default which remained uncured, the Franchise Agreement was being terminated effective on the day thereof (the "Termination Notice").  A true and correct copy of the Termination Notice and other correspondence sent to Defendant or its attorney is attached hereto as Composite Exhibit "D."

19.    Despite the fact that the Franchise Agreement was terminated by Chicken Kitchen effective January 9, 2006, Defendants continued to operate the Location as a Chicken Kitchen restaurant and continued to use Chicken Kitchen's Marks and System in connection with the operation of this restaurant.  Such use of the Marks and System is not authorized by any franchise or licensing agreement or by any other contract or agreement with Chicken Kitchen or by consent of Chicken Kitchen.

## COUNT I
## TRADEMARK INFRINGEMENT – LANHAM ACT

20.    Chicken Kitchen realleges and incorporates by reference paragraphs 1 through 19, as though fully set forth herein.

9

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

21.     Defendants' aforementioned acts, practices and conduct constitute a use in commerce of a reproduction, counterfeit, copy or colorable imitation of the Marks in connection with their unauthorized operation of Chicken Kitchen restaurants at the Location and the sale, offering for sale, distribution and advertising of products and services in connection therewith, and such use is likely to cause confusion and mistake or to deceive the public, in violation of 15 U.S.C. § 1114(1).

22.     Defendants' infringement and trademark misuse is calculated and intended to mislead the public into believing that Defendants' restaurant at the Location are associated with, sponsored by or similar to a Chicken Kitchen restaurant.

23.     As a direct and proximate result of the foregoing acts, practices and conduct, Plaintiff has been or is likely to be substantially injured in its business, including its reputation and business identity, resulting in lost revenues and profits and diminished goodwill and reputation.

24.     Plaintiff has no adequate remedy at law because the Marks and other proprietary symbols and systems are unique and represent to the public the identity, reputation and goodwill of Chicken Kitchen restaurants operated by Chicken Kitchen and its franchisees.  The damages caused by Defendants' actions are not susceptible to any ready or precise calculation in that such damages involve lost profits, lost business opportunities, loss of goodwill, and the impairment of the integrity of the System, such

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

that monetary damages alone cannot fully compensate Plaintiffs for Defendants' misconduct.

25.     Unless enjoined by the Court, Defendants will continue to use and infringe the Marks and other proprietary symbols and systems to Plaintiff causing irreparable injury. This threat of future injury to Plaintiff's business, identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued infringement and trademark misuse, and to ameliorate and mitigate Plaintiff's injury.

## COUNT II
## UNFAIR COMPETITION – LANHAM ACT

26.     Chicken Kitchen realleges and incorporates by reference paragraph 1 through 19, as though fully set forth herein.

27.     Plaintiff is the prior user of the Marks.

28.     The foregoing acts, practices and conduct of Defendants constitute unfair competition, false designation, description or representation, false advertising, fraud, or unfair or deceptive trade practices that are likely to cause confusion and mistake by patrons of their restaurants and the public, in violation of 15 U.S.C. § 1125(a).

29.     Defendants' misconduct is calculated and intended to deceive and mislead the public into believing that Defendants' Chicken Kitchen restaurant is associated with, sponsored by or similar to a Chicken Kitchen restaurant.

30.     As a direct and proximate result of the foregoing acts, practices and conduct, Chicken Kitchen has been or is likely to be substantially injured in its business,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

including its reputation and business identity, resulting in lost revenues and profits, and diminished goodwill and reputation.

31.     Chicken Kitchen has no adequate remedy at law because its distinctive and proprietary System and Marks are unique and represent to the public the identity, reputation and goodwill of the Chicken Kitchen restaurants operated by Chicken Kitchen and its franchisees.  The damages caused by Defendants' actions are not susceptible to any ready or precise calculation in that such damages involve lost profits, lost business opportunities, loss of goodwill, and the impairment of the integrity of the System and Marks, such that monetary damages alone cannot fully compensate Plaintiff for Defendants' misconduct.

32.     Unless enjoined by the Court, Defendants will continue to make false descriptions or representations and to pass off their restaurants as affiliated with, sponsored by or similar to a Chicken Kitchen restaurant to Chicken Kitchen's irreparable injury.  This threat of future injury to Chicken Kitchen's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued false descriptions or representations and passing off, and to ameliorate and mitigate Chicken Kitchen's injury.

## COUNT III
## COMMON LAW UNFAIR COMPETITION

33.     Chicken Kitchen realleges and incorporates by reference paragraph 1 through 19, as though fully set forth herein.

12

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

34.     Defendants are using the Marks to market similar products in competition with Chicken Kitchen and other Chicken Kitchen franchisees in the Miami and nearby markets, and such conduct is calculated and intended to deceive and mislead the public into believing that Defendants' Location is associated with, sponsored by or similar to a Chicken Kitchen restaurant, in violation of the common law of the State of Florida.

35.     The foregoing acts, practices and conduct of Defendants are likely to confuse and mislead the public into believing that Defendants and Defendants' restaurants are associated with, sponsored by, affiliated with or related to Chicken Kitchen and its franchised Chicken Kitchen restaurants, thereby benefitting the Defendants from the goodwill and reputation associated with the System and Marks.

36.     As a direct and proximate result of the foregoing acts, practices and conduct, Chicken Kitchen has been or is likely to be substantially injured in its business, including its reputation and business identity, by Defendants' unfair competition, resulting in lost revenues and profits and diminished goodwill and reputation.

37.     Chicken Kitchen has no adequate remedy at law because its distinctive and proprietary System and Marks are unique and represent to the public the identity, reputation and goodwill of Chicken Kitchen restaurants operated by Chicken Kitchen and its franchisees.  The damages caused by Defendants' actions are not susceptible to any ready or precise calculation in that such damages involve lost profits, lost business opportunities, loss of goodwill, and the impairment of the integrity of the System and

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

Marks, such that monetary damages alone cannot fully compensate Chicken Kitchen for Defendants' misconduct.

38.     Unless enjoined by the Court, Defendants will continue to make false descriptions or representations and to pass of their restaurants as affiliated with, sponsored by or similar to a Chicken Kitchen restaurant causing Chicken Kitchen irreparable injury.  This threat of future injury to Chicken Kitchen's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued false descriptions or representations and passing off, and to ameliorate and mitigate Chicken Kitchen's injury.

**COUNT IV**
**BREACH OF FRANCHISE AGREEMENT – USE OF SYSTEM AND MARKS**

39.     Chicken Kitchen realleges and incorporates by reference paragraph 1 through 19, as though fully set forth herein.

40.     The foregoing acts, practices and conduct of Defendants constitute, *inter alia*, a breach of their contractual obligations under the Franchise Agreement to use the Marks only in connection with the operation of a franchise Chicken Kitchen restaurant and to refrain from using the Marks upon termination of the Franchise Agreement.

41.     As a direct and proximate result of Defendants' breaches of their contractual obligations under the Franchise Agreement, Chicken Kitchen and its franchisees have been and will continue to be irreparably injured through infringement, misuse, diminution and dilution of the goodwill and consumer recognition associated

14

with the System and Marks.  The damages caused by Defendants' misconduct and the foregoing contractual breaches include lost profits, lost business opportunities, loss of goodwill, and the dilution of the System and Marks.

42.    Chicken Kitchen has no adequate remedy at law because its distinctive and proprietary System and Marks are unique and represent to the public the identity, reputation and goodwill of Chicken Kitchen restaurants.  The damages caused by Defendants' contractual breaches are not susceptible to any ready or precise calculation in that such damages involve lost profits, lost business opportunities, loss of goodwill, and the impairment of the System and Marks, such that monetary damages alone cannot fully compensate Chicken Kitchen for Defendants' breaches of contract and resultant trademark infringement, misuse, unfair practices, deception and misconduct.

43.    Unless enjoined by this Court, Defendants will continue to breach their obligations under the Franchise Agreement and to infringe and misuse Chicken Kitchen's distinctive and proprietary System and Marks to Chicken Kitchen's irreparable injury. This threat of future injury to Chicken Kitchen's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued infringement and misuse and to ameliorate and mitigate Chicken Kitchen's injury.

## COUNT V
## BREACH OF FRANCHISE AGREEMENTS – COVENANT NOT TO COMPETE

44.    Chicken Kitchen realleges and incorporates by reference paragraphs 1 through 19, as though fully set forth herein.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

45.     The foregoing acts, practices and conduct of Defendants constitute, inter alia, a breach of their contractual obligations under the Franchise Agreement to refrain for a period of 24 months from the date of termination of the agreements from having any interest in or being employed by a competing business at a site within a radius of five (5) miles of either Locations or within a radius of five (5) miles of any other Chicken Kitchen restaurant.

46.     As a direct and proximate result of Defendants' breaches of their contractual non-competition covenant, Chicken Kitchen and its franchisees have been and will continue to be irreparably injured through Defendants' misconduct and the resultant diminution and dilution of the goodwill and consumer recognition associated with plaintiff's System and Marks.

47.     Chicken Kitchen has no adequate remedy at law because the damages caused by Defendants' contractual breaches are not susceptible to any ready or precise calculation in that such damages involve lost profits, lost business opportunities, loss of goodwill, and the impairment of the integrity of the franchise network and System, such that monetary damages alone cannot compensate Chicken Kitchen for Defendants' breaches of contract and unauthorized operation of competing restaurants using the System and Marks.

48.     Unless enjoined by the Court, Defendants will continue to breach their obligations under the Franchise Agreement causing Chicken Kitchen irreparable injury.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

This threat of future injury to Chicken Kitchen's franchise network, business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued breach of contract and unauthorized operation of competing restaurants using the System and Marks, and to ameliorate and mitigate Chicken Kitchen's injury.

## COUNT VI
## BREACH OF FRANCHISE AGREEMENT – CONTINUING
## FRANCHISE FEES AND ADVERTISING FEES

49.    Chicken Kitchen realleges and incorporates by reference paragraphs 1 through 19, inclusive, as though fully set forth herein.

50.    By failing to pay continuing franchise fees and advertising fees on gross revenues generated at the Location, Defendants have breached the terms of the Franchise Agreement prior to its termination.

51.    As a direct and proximate result of the aforementioned breaches, Chicken Kitchen has been damaged in an amount not now capable of determination.

## COUNT VII
## ACCOUNTING

52.    Chicken Kitchen realleges and incorporates by reference paragraphs 1 through 19, as though fully set forth herein.

53.    Pursuant to the provisions of the Franchise Agreement and by virtue of their inequitable conduct, Defendants are obligated to provide Chicken Kitchen with an accounting of the gross receipts and revenues derived by them from the operation of the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

Location from July 23, 2005, until Defendants cease to operate their restaurant in violation of Chicken Kitchen's statutory and common law rights and provisions of the Franchise Agreement.

54.     Such an accounting is necessary to determine the amount of continuing franchise fees and advertising fees due to Chicken Kitchen from and after July 23, 2005, when Defendants ceased reporting their gross revenues, and to determine the extent of the unjust enrichment derived by Defendants from their unauthorized use, infringement, misuse and misappropriation of the System and Marks at the Location.

55.     The amount of revenues received by Defendants at the Location is peculiarly within Defendants knowledge and Chicken Kitchen requires an accounting to determine the amount of such revenues.

56.     In addition, by virtue of their inequitable conduct, Defendants are obligated to provide Chicken Kitchen with an accounting of the gross receipts derived by them from the operation of the Location from the date that location opened until they ceased operating that location in violation of Chicken Kitchen's statutory and common law rights.

57.     Such an accounting is necessary to determine the extent of the unjust enrichment derived by Defendants from their unauthorized use, infringement, misuse and misappropriation of the System and Marks at the Location.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

58.    The amount of revenues received by Defendants at the Location is peculiarly within their knowledge and Chicken Kitchen requires an accounting to determine the amount of such revenues.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in its favor and against Defendants, jointly and severally, as follows:

A.    That the Court find, adjudge and decree that Defendants, and each of them, have violated the laws and common law of the United States and the State of Florida as set forth herein.

B.    That Defendants, and each of them, as well as their officers, agents, partners, successors, servants and employees, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from:

1.    Using the service marks, trade names and trade marks incorporating the words "Chicken Kitchen" and/or "Chop-Chop," or any confusingly similar designation, alone or in combination with any other words, as a service mark, trade mark or trade name component;

2.    Using the distinctive and proprietary Chicken Kitchen restaurant System, including, but not limited to, Chicken Kitchen's marketing and advertising methods, operating procedures and materials, preferred or approved sources of supply, recipes, promotional activity and training programs, in

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

connection with any business other than a duly licensed Chicken Kitchen restaurant;

3.      Directly or indirectly, individually or as a member of any business organization, engaging in the production or sale at retail of any chicken product or having any employment or interest in any firm engaged in the production or sale at retail of any such products, at the  Location or within a five (5) mile radius of the Location;

4.      Unfairly competing with Chicken Kitchen in any manner;

5.      Causing likelihood of confusion or injury to Chicken Kitchen's business reputation;

6.      Passing off any of their services or products as those of Chicken Kitchen;

7.      Causing likelihood of confusion or misunderstanding as to source or sponsorship of their services or products; and

8.      Using Chicken Kitchen's confidential proprietary information and trade secrets.

C.      That with respect to the Location, Defendants be preliminarily and permanently mandatorily enjoined to:

1.      Return to Chicken Kitchen any and all copies of operations manuals in their possession or control;

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

2.    Take such action as may be necessary to cancel all assumed name or equivalent registrations relating to the use of the Marks and to notify the telephone company and listing agencies of the termination of Defendants' right to use all telephone numbers and classified and directory listings under the "Chicken Kitchen" proprietary name;

3.    Use their best efforts to eliminate promptly the words "Chicken Kitchen" and any other confusingly similar designation used in connection with the Location from all telephone directories and any other advertising material including, but not limited to, brochures, mailers, newspapers and magazines;

4.    Comply with Article "XVI. Obligations Upon Termination or Expiration" of the Franchise Agreement as follows"

F.    *Franchisee shall, at Franchisor's option, assign to Franchisor or its designee Franchisee's interest in any lease or sublease for the premises of the Franchise Business. If Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Franchise Busniess...*

K.    *Franchisor shall have the option, excersibale within 30 days after termination or expiration, to purchase from Franchisee the furnishings, equipment, signs, fixtures, supplies, inventory, and other tangible assets of the Franchise Business at fair market value. If the parties are unable to agree on the fair market value within a reasonable time, an independent appraiser shall be designated by Franchisor, which appraiser's determination shall be binding. Franchisor shall receive a credit against the purchase price for any sums, which are owed to it or a subsidiary or affiliate by Franchisee, the cost of the appraisal, if any, and for any monies, which Franchisor expends for obligations of Franchisee. Upon payment of the purchase price, Franchisee shall deliver to Franchisor or its designee a bill of sale conveying title to the property free and clear of*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

*all encumberances, and such other documents reasonably required to effect a complete transfer of Franchisee's right, title, and interest in the assets. Franchisee shall ensure that notice is given to all creditors pursuant to the applicable bulk transfer laws of the state where the Franchise Business was located, and shall hold Franchisor harmless from any and all claims of Franchisee's creditors.*

    5.    Promptly remove, and discontinue using for any purpose, any and all signs, fixtures, menus, paper goods, décor items, furnishing, equipment, advertising materials, stationery supplies, forms and other articles which display any of the Marks or any distinctive features or designs associated with Chicken Kitchen restaurants.

    D.    That the Defendants be directed to file with this Court and to serve on Chicken Kitchen within 30 days after entry of an injunction order, a written report, under oath, setting forth the manner in which they have complied with the injunction.

    E.    That the Defendants be ordered to render an accounting to Chicken Kitchen of the gross revenues of the Location from July 23, 2005 to the date on which Defendants cease using the Marks; and that upon such accounting the Defendants be ordered to pay to Chicken Kitchen past due continuing franchise fees and advertising fees from July 23, 2005, to the date on which Defendants cease using the Marks and to pay to Chicken Kitchen such other sums due to it for Defendants unauthorized use of Chicken Kitchen Marks after termination of the Franchise Agreement.

    F.    That the Defendants be ordered to render an accounting to Chicken Kitchen of the gross revenues of the Location from the date that Location opened until

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

the date on which Defendants cease using the Marks; and that upon such accounting the Defendants be ordered to pay to Chicken Kitchen the sums due to it for Defendants' unauthorized use of Chicken Kitchen's Marks at that location.

G.     That Defendants be ordered to pay Chicken Kitchen such sums as shall be found owing for continuing franchise fees and advertising fees.

H.     That Plaintiffs recover three times the damages to their goodwill and marks resulting from Defendants' infringement of those marks, and the Defendants' profits from infringing those marks, as provided by 15 U.S.C. § 1117.

I.     That Plaintiff recover its attorneys' fees and costs in this action, as provided by 15 U.S.C. § 1117.

J.     That Plaintiff be awarded such further relief as the Court may deem just and proper.

Respectfully submitted,

MELAND, RUSSIN & BUDWICK, P.A.
Attorneys for Chicken Kitchen
3000 Wachovia Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
Tel: (305) 358-6363
Fax: (305) 358-1221

By:

PETER D. RUSSIN
Fla. Bar No. 765902
DANIEL N. GONZALEZ
Fla. Bar No. 0592749

23

J:\DOCS\CLIENTS\5074\5074-1\00137769.DOC

COPY

# ROYAL OAK CAPITAL, LLC.

## Successor to Chicken Kitchen Corporation

### FRANCHISE AGREEMENT

**Manresa Corporation**

**Franchisee**

Exhibit "A"

# CHICKEN KITCHEN FRANCHISE AGREEMENT

INTRODUCTION ................................................................................................................. 3
I.      GRANT ................................................................................................................. 3
II.     TERMS AND RENEWAL ................................................................................... 4
III.    DUTIES OF FRANCHISOR ............................................................................... 4
IV.    FEES ....................................................................................................................... 5
V.     CONSTRUCTION OF RESTAURANT ........................................................... 6
VI.    TRAINING ........................................................................................................... 7
VII.   DUTIES OF FRANCHISEE ............................................................................... 7
VIII.  PROPRIETARY MARKS ................................................................................... 10
IX.    CONFIDENTIAL MANUAL OF OPERATING PROCEDURES ("MOP") ...... 11
X.     CONFIDENTIAL INFORMATION ................................................................. 12
XI.    ACCOUNTING AND RECORDS ...................................................................... 12
XII.   ADVERTISING ................................................................................................... 13
XIII.  INSURANCE ....................................................................................................... 15
XIV.  TRANSFER OF INTEREST ............................................................................. 15
XV.   DEFAULT AND TERMINATION ..................................................................... 18
XVI.  OBLIGATIONS UPON TERMINATION OR EXPIRATION ...................... 19
XVII.  COVENANTS ....................................................................................................... 20
XVIII. TAXES, PERMITS, AND INDEBTEDNESS .................................................... 21
XIX.  INDEPENDENT CONTRACTOR AND INDEMNIFICATION ................... 22
XX.   APPROVALS AND WAIVERS ......................................................................... 22
XXI.  NOTICES ............................................................................................................. 23
XXII.  ENTIRE AGREEMENT ...................................................................................... 23
XXIII. SEVERABILITY AND CONSTRUCTION ...................................................... 23
XXIV. APPLICABLE LAW ........................................................................................... 24
XXV.  ACKNOWLEDGMENTS .................................................................................... 24

CHICKEN KITCHEN FRANCHISE AGREEMENT

## *CHICKEN KITCHEN*

## FRANCHISE AGREEMENT

This Agreement is entered into as of the 30th day of January, 2002 by and between Royal Oak Capital, LLC, Successor to Chicken Kitchen Corporation, a Florida corporation (Franchisor), and Manresa Corporation, a Florida Corporation (Franchisee).

## INTRODUCTION

A.       Franchisor has the right to establish, operate and to license others to operate restaurants which feature marinated grilled chicken and complimentary menu items including fresh salads, rice, baked potatoes, beans, corn, fruit salad, soups, sauces, desserts and beverages, and which offer delivery service (the Chicken Kitchen System).

B.       The Chicken Kitchen System includes certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including the mark CHICKEN KITCHEN®, the chicken logo and other trade names, service marks, and trademarks as are now, or in the future may be, designated by Franchisor for use in connection with the Chicken Kitchen System (the "Proprietary Marks"), quality food products, distinctive design, decor, color scheme and interior layout for the restaurants, specifications for equipment and menu items, operating procedures, and business practices and policies.

C.       Franchisor continues to develop, use, and control the use of the Proprietary Marks so that the public will recognize the Chicken Kitchen System as the source of services and products having high standards of quality, appearance, and service.

D.       Franchisee wishes to acquire the right to use the Chicken Kitchen System at the location specified in this Agreement.

E.       Franchisee understands and acknowledges the importance of the high standards of quality, cleanliness, appearance and service of the Chicken Kitchen System, and the necessity of operating the franchise business in substantial conformity with the reasonable standards and specifications specified by Franchisor.

NOW, THEREFORE, the parties, in consideration of the undertakings and commitments set forth in this Agreement, agree as follows:

## 1.    GRANT

A.       Franchisor grants to Franchisee a non-exclusive license and franchise to open and operate a Chicken Kitchen Restaurant within the Keystone Plaza Shopping Center, 13575 Biscayne Blvd., North Miami Beach, Florida (the "Franchise Business"). Franchisee agrees to operate the Franchise Business throughout the term of this Agreement in conformity with the terms of this Agreement.

B.       This license is for the designated location only. Franchisee may not relocate the Franchise Business without the prior written consent of Franchisor. If, at the time of execution of this Agreement, the location of the Franchise Business is not known, Franchisee shall lease or acquire a location, subject to Franchisor's approval as provided in the Site Selection Addendum, attached as Rider A. Provided Franchisee is not in default under this Agreement, Franchisor agrees not to open or grant a license to anyone other than Franchisee to open a restaurant utilizing the Chicken Kitchen System within 2 mile-radius of the Franchise Business if the Franchise Business is located in a suburban area or within ½ mile of the Franchise Business if the Franchise Business is located in a downtown or densely populated area (the "Protected Area").

C.       Franchisor may use, and license others to use, the Chicken Kitchen System for the operation of restaurants at any location outside the Protected Area on such terms and conditions as Franchisor deems appropriate. Also, Franchisor may market products bearing the Proprietary Marks which are the same as or similar to products sold or used in the Franchise Business through retail outlets other than restaurants that

CHICKEN KITCHEN FRANCHISE AGREEMENT

may be located in and outside of the Protected Area.  In addition, Franchisor may acquire chicken restaurants or companies which own or franchise chicken restaurants which are located within or outside the Protected Area and may use, or license the use of, other marks at any location within or outside the Protected Area for the operation of restaurants which may be similar to the Franchise Business, without offering Franchisee the right to open the restaurant(s).

II.  **TERMS AND RENEWAL**

    A.    The term of this Agreement shall expire on the 20th anniversary of the date the Franchise Business opens for business.

    B.    Franchisee may renew this Agreement for 1 additional term of 20 years, provided:

    1.    Franchisee gives Franchisor written notice of Franchisee's election to renew not less than 12 months, nor more than 15 months, prior to the end of the initial term.

    2.    Franchisee renovates and modernizes the Franchise Business premises, including equipment, signs, decor and furnishings, to reflect the then current standards and image of the Chicken Kitchen System.

    3.    Franchisee is not, at the time of notice and at the time of renewal, in default of any provision of this Agreement, or any other agreement between Franchisee and Franchisor or any subsidiary or affiliate of Franchisor, and Franchisee has performed its obligations throughout the terms of the agreements.

    4.    Franchisee has satisfied all monetary obligations owed by Franchisee to Franchisor and Franchisor's subsidiaries and affiliates, and has timely met those obligations throughout the term of this Agreement.

    5.    Franchisee has the right to remain in possession of the designated location for the duration of the renewal term.

    6.    Franchisee executes Franchisor's then current form of renewal franchise agreement, which agreement shall supersede and replace this Agreement. The terms and conditions of the renewal franchise agreement may not differ materially from the provisions of this Agreement.

    7.    To the fullest extent permitted by law, Franchisee executes a general release of all claims against Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees.

III.  **DUTIES OF FRANCHISOR**

    A.    Franchisor shall make available to Franchisee standard plans and specifications for the layout of a Chicken Kitchen Restaurant. These plans and specifications may be used only in the preparation of final plans and specifications for the Franchise Business.  An architect and/or engineer must be employed by Franchisee to prepare final architectural and mechanical plans and specifications, which plans must be approved by Franchisor.

    B.    Franchisor will, upon request, provide guidelines for evaluating proposed sites for the Franchise Business.

    C.    Franchisor will make available an initial training program prior to the opening of the Franchise Business for Franchisee, the initial General Manager and a manager trainee, and the Head Cook, and shall make available such other training programs for Franchisee and Franchisee's employees, as Franchisor deems appropriate.

    D.    Franchisor shall provide up to 7 days of pre-opening and opening guidance and assistance at the Franchise Business.

    E.    Franchisor shall provide continuing advisory assistance to Franchisee in the operation, advertising and promotion of the Franchise Business, as Franchisor deems advisable.  The advisory assistance may be provided in person or by telephone, E-mail or written communication.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

F.    Franchisor shall make available, from time to time, advertising and promotional materials for local advertising as described in Section XIII.B. Franchisee must pay, within 30 days of invoicing, the charge for all materials ordered by Franchisee.

G.    Franchisor shall provide Franchisee with bookkeeping guidelines and procedures for maintaining internal financial controls.

H.    Franchisor shall loan to Franchisee 1 numbered copy of the Manual of Operating Procedures (the "MOP") as more fully described in Section IX. If the MOP is lost or damaged, Franchisor will furnish Franchisee with a replacement MOP for $500.

I.    Upon request of Franchisee, provided Franchisor has personnel available, Franchisor shall provide additional consulting services. Franchisee shall pay Franchisor for additional consulting services requested by Franchisee the sum of $300.00, as adjusted each January to reflect changes in the Consumer Price Index. All Items (CPI-W) with the base year being January 1999, per day (up to a maximum of 8 hours) per person plus all travel, lodging, meals and other reasonable expenses incurred by Franchisor's personnel who provide the requested consulting services.

## IV. FEES

A.    <u>Franchise Fee</u>   -  The initial franchise fee is $30,000.

B.    <u>Royalty Fee</u> -  During the initial term of this Agreement, Franchisee shall pay to Franchisor a continuing weekly royalty fee in an amount equal to 5% of Gross Sales for the preceding week, as defined in Section IV.E.

C.    <u>Advertising Fund Fee</u> – On or before the 20th day of each calendar month throughout the term of this Agreement, Franchisee shall pay to the Chicken Kitchen Advertising Fund, which is administered by the Franchisor, an advertising contribution fee in an amount equal to .75% of the Gross Sales received by Franchisee from the operation of the Chicken Kitchen restaurant during the calendar month next preceding the date of such payment. The amount due to Franchisor by Franchisee shall be in addition to and separate from that which Franchisee is obligated to spend pursuant to Section IV.D of this agreement.

D.    <u>Advertising Cooperative Fee</u> - In the event the Chicken Kitchen restaurant lies within a DMA for which a Franchisor approved advertising cooperative has been formed, Franchisee shall contribute to such advertising cooperative an amount required by such advertising cooperative on a schedule required by such advertising cooperative, provided that such contributions shall occur no less often than each calendar quarter and shall be of an amount not less than 2% of Franchisee's Gross Sales from the operation of the Chicken Kitchen restaurant during each partial or full calendar month. In the event there exists no Franchisor-approved advertising cooperative in the DMA in which the Chicken Kitchen restaurant is located, during each calendar quarter of the term of this agreement, Franchisee shall spend for approved advertising and promotion of the Chicken Kitchen restaurant (including, but not limited to, television time, radio time, newspaper display space, distributed promotional materials, but not including any amount spent on sign rent, paper products, candy, or other foods which evidence Franchisor's trademarks or color patterns and the like) an amount equal to but not less than 2% of Franchisee's Gross Sales from the operation of the Chicken Kitchen restaurant during each partial or full calendar quarter.

1.    For purposes of determining the amount, which the Franchisee is required to spend for each calendar quarter, which is the subject of review, the parties hereto agree that the first two months of such calendar quarter and last month of the preceding calendar quarter shall be used in the determining the Gross Sales of the Chicken Kitchen restaurant. This three-month period will be used to determine the expenditures required for the next quarter. For example, to determine the expenditures required for January, February, and March, the parties hereto agree they will look to December, January, and February sales in order to determine the Gross Sales to determine the amount which must be expended by the Franchisee. In the event the amounts required are not spent in a timely fashion, Franchisee shall pay Franchisor the balance to be used in the Chicken Kitchen Advertising Fund.

E.    <u>Local Advertising Fee</u> - Franchisee (whether a Franchisor-approved advertising cooperative exists or not) shall spend not less than 1.25 % of Gross Sales locally. Expenditures for local advertising are for

### CHICKEN KITCHEN FRANCHISE AGREEMENT

approved advertising and promotion vehicles for the Chicken Kitchen restaurant (including, but not limited to, television time, radio time, newspaper display space, distributed promotional materials, but not including any amount spent on sign rent, paper products, candy, or other foods which evidence Franchisor's trademarks or color patterns and the like).

F.    All weekly and/or monthly payments required by this Section IV and by Section XII, together with the reports or statements required by Section XI, must be received by Franchisor by the Friday following the end of the week for which the payment and reports relate. Any payment or report not received by Franchisor on or before the due date shall be deemed overdue. Franchisee shall pay Franchisor interest on any past-due amount from the date it was due until paid at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. Entitlement to interest shall be in addition to any other remedies Franchisor may have.

G.    As used in this Agreement, "Gross Sales" includes all revenue from the sale of food, merchandise and services by the Franchise Business, including all delivered items, whether for cash or credit, and regardless of collection in the case of a credit sale, and shall include all payments to Franchisee under any business interruption insurance or similar insurance policy, and income of every kind and nature related to the Franchise Business including sales away from the premises through mobile units or temporary facilities at special events if Franchisor permits such sales. Gross Sales shall not include revenues from any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

## V. CONSTRUCTION OF RESTAURANT

A.    Before commencing construction of the Franchise Business premises, Franchisee, at Franchisee's expense, shall comply with all of the following requirements:

1.    Franchisee must obtain all zoning classifications, approvals and permits required by state and local law for the construction and operation of the Franchise Business. Franchisee shall certify in writing to Franchisor that all such permits and approvals have been obtained.

2.    Franchisee shall employ a qualified architect or engineer to prepare final plans and specifications for the construction of Franchise Business premises based upon the standard plans and specifications furnished by Franchisor. The plans must be approved by Franchisor in writing before the commencement of construction, and once approved by Franchisor; the plans may not be changed without the prior written consent of Franchisor.

3.    Franchisee shall employ a qualified, licensed general contractor to construct the Franchise Business premises. Franchisee shall obtain and maintain in force, during the entire period of construction, the insurance required under Section XIII.

B.    During the period of construction, Franchisor and its agents shall have the right to inspect the construction site at all reasonable times.

C.    Franchisee shall complete construction (including all exterior and interior carpentry, electrical, plumbing, painting and finishing work, and installation of all furniture, fixtures, equipment, and signs) in accordance with the approved final plans, at Franchisee's expense, within 6 months after the Franchise Business premises are leased or purchased (exclusive of time lost by reason of strikes, lockouts, fire, and other casualties and acts of God, or factors reasonably beyond the control of the Franchisee).

D.    Franchisee). Upon request, which shall not be unreasonably withheld, Franchisor will grant reasonable additional time to the Franchisee to complete construction.

E.    Franchisee shall notify Franchisor when the construction is completed, and within a reasonable time after notice, Franchisor shall inspect the Franchise Business premises. Franchisee may not open the Franchise Business without written authorization from Franchisor, and Franchisor's authorization to open may be conditioned upon Franchisee's compliance with the specifications of the approved final plans and with the standards of the Chicken Kitchen System.

F.    Franchisee shall open the Franchise Business within 10 days after receipt of Franchisor's written authorization to open. The parties agree that time is of the essence in the construction and opening of the Franchise Business.

CHICKEN KITCHEN FRANCHISE AGREEMENT

## VI.  TRAINING

A.     Prior to the opening of the Franchise Business, Franchisee (or, if Franchisee is a corporation. a principal of the corporation designated to supervise the operation of the Franchise Business approved by Franchisor) and the General Manager shall attend and successfully complete, to Franchisor's reasonable satisfaction, the management-training program offered by Franchisor. The management-training program shall be conducted in Company training stores and at times and for periods specified by Franchisor. Any persons subsequently employed by Franchisee in the position of General Manager must complete Franchisor's management training program. Franchisee agrees that someone who has not successfully completed the management-training program will at no time manage the Franchise Business on a permanent basis.

B.     Prior to the opening of the Franchise Business, two individuals must successfully complete, to Franchisor's reasonable satisfaction, the Head Cook training program.  Any persons subsequently employed by Franchisee, as the Head Cook shall also attend and successfully complete Franchisor's Head Cook training program.

C.     Franchisee agrees to participate in continuing training programs, which may be offered by Franchisor to implement new operational and merchandising standards. Franchisee shall offer a training program for employees of the Franchise Business and agrees to staff the Franchise Business at all times with a staff of trained employees sufficient to operate the Franchise Business in accordance with this Agreement and the MOP.

D.     There will be no charge for attending the initial management and Head Cook training program; however, Franchisor may impose a reasonable fee for attendance at subsequent management and Head Cook training programs, for continuing training programs and for training materials.  Franchisee shall pay all travel and living expenses, compensation, workers' compensation and other expenses incurred by Franchisee and Franchisee's employees when attending the training programs.

## VII.  DUTIES OF FRANCHISEE

A.     Franchisee understands and acknowledges that compliance with every detail of the Chicken Kitchen System in the operation of the Franchise Business is important to Franchisee, Franchisor and other franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all restaurants which are part of the Chicken Kitchen System, and to protect Franchisor's reputation and the goodwill of the Chicken Kitchen System.

B.     A corporate Franchisee must comply with the following requirements throughout the term of this Agreement:

1.     Franchisee shall furnish Franchisor with its Articles of Incorporation, Bylaws, other governing documents and any other documents Franchisor may reasonably request, and any amendments.

2.     Franchisee shall limit Franchisee's activities, and its Articles of Incorporation and Bylaws shall at all times provide that Franchisee's only business activities shall be operating the Franchise Business and other businesses operated under franchises granted by Franchisor.

3.     Franchisee shall maintain stop transfer instructions against the transfer of any equity securities; and shall issue no securities which do not contain the following printed legend:

THE TRANSFER OF THIS STOCK IS SUBJECT TO THE TERMS AND CONDITIONS OF A FRANCHISE AGREEMENT WITH CHICKEN KITCHEN CORPORATION. REFERENCE IS MADE TO THE PROVISIONS OF THE FRANCHISE AGREEMENT AND TO THE ARTICLES OF INCORPORATION AND BYLAWS OF THIS CORPORATION.

4.     There shall be no material transfer or issuance of Franchisee's stock without the prior written approval of Franchisor.

5.     All shareholders of Franchisee must agree to be bound by the terms and conditions of this Agreement.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

6.  Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and shall furnish the list to Franchisor upon request.

C.  A Franchisee which is a partnership must comply with the following requirements throughout the term of this Agreement:

1.  Franchisee shall furnish Franchisor with a copy of the partnership agreement and such other documents as Franchisor may reasonably request and all amendments.

2.  Franchisee shall prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee.

D.  A Franchisee who operates the Franchise Business as a sole proprietor must, unless otherwise approved in writing by Franchisor, devote his full time and best efforts to the day-to-day operation of the Franchise Business with no other operational or management commitments in other businesses (other than restaurants operated under franchises granted by Franchisor).

E.  A Franchisee which is a limited liability company must comply with the following requirements throughout the term of this Agreement:

1.  Franchisee shall furnish Franchisor with its Articles of Organization, Regulations and Operating Agreement, other governing documents and any other documents Franchisor may reasonably request, and any amendments.

2.  Franchisee shall limit Franchisee's activities, and its Articles of Organization and Regulations and Operating Agreement shall at all times provide that Franchisee's only business activities shall be operating the Franchise Business and other businesses operated under franchises granted by Franchisor.

3.  Franchisee shall prepare and furnish to Franchisor, upon request, a current list of all members of Franchisee organization.

F.  Franchisee shall use the Franchise Business premises solely for the operation of a Chicken Kitchen Restaurant. The Franchise Business shall be open during such hours and days as Franchisor may from time to time specify in the MOP or as Franchisor may otherwise approve in writing as may be limited by landlord or governmental authority.

G.  Franchisee agrees that the Franchise Business shall at all times be under the direct, on premises supervision of Franchisee or a trained management level employee. Franchisee agrees to maintain a competent, conscientious, trained staff, and to take such steps as are necessary to ensure that all employees of the Franchise Business keep a neat and clean personal appearance, preserve good customer relations and comply with the dress codes prescribed by Franchisor.

H.  Franchisee shall meet and maintain a high health standard and ratings applicable to the operation of the Franchise Business as per the MOP and local health ordinance. Franchisee shall furnish to Franchisor, within 5 days after receipt, a copy of any violation or citation, which indicates Franchisee's failure to maintain local health or safety standards in the operation of the Franchise Business.

I.  To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise Business in strict conformity with such methods, standards and specifications as Franchisor may from time to time prescribe in the MOP or otherwise in writing. Franchisee agrees:

1.  To maintain in sufficient supply and to use at all times, only such fixtures, furnishings, equipment, signs, menu items, ingredients, products, materials, supplies and paper goods as conform to the standards and specifications prescribed or approved by Franchisor.

2.  To use in the Franchise Business only menus and promotional materials, which comply with Franchisor's prescribed specifications.

3.  To sell or offer for sale only menu items, products and services approved in writing by Franchisor; to sell or offer for sale all menu items, products and services specified by Franchisor; to refrain from any deviation from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue selling and offering for sale any menu items, products or services which Franchisor may, in its discretion, disapprove in writing at any time. With respect to the offer and sale of all menu items, products and services, Franchisee shall have sole discretion as to the prices to be charged to customers.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

4.   To purchase and install, at Franchisee's expense, all fixtures, furnishings, equipment, and signs which Franchisor may reasonably specify in the MOP or otherwise in writing, and to refrain from installing or permitting to be installed on or about the Franchise Business premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, public telephones, signs, vending and amusement machines or other items not previously approved as meeting Franchisor's standards and specifications.

J.      The availability of delivery service and on and off premises catering are important elements of the Chicken Kitchen System.  Franchisee agrees to provide delivery and catering services within a 2 mile radius of the Franchise Business, except that the required delivery area shall be 10 blocks if the Franchise Business is located in a downtown or densely populated area (the "Delivery Area") and may provide these services outside the Delivery Area as long as the delivery or catering address is not within the Delivery Area of another restaurant which is a part of the Chicken Kitchen System.  Franchisor shall arbitrate any conflict between Franchisee and another franchisee as to the boundary of the Delivery Area, and the decision of Franchisor shall be final and binding.  Franchisee acknowledges that another Franchisee's delivery area may extend into Franchisee's Delivery Area so that certain addresses in the Delivery Area may be able to obtain delivery services from the Franchise Business and a restaurant operated by another Franchisee.  Franchisee agrees not to charge a separate fee for delivery service nor to charge menu prices for delivery service which are different than those charged for purchases made in the Franchise Business.  Delivery and catering services shall be conducted in accordance with directives of Franchisor set out in the MOP or otherwise in writing.

K.      Franchisee shall purchase all food items, ingredients, supplies, materials and other products used or offered for sale in the Franchise Business, and all fixtures, furnishings, equipment (including cash registers and any computer hardware and/or software) and signs from suppliers (including manufacturers, distributors and other sources) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then current standards and specifications for such items, who possess adequate quality controls and capacity to promptly and reliably deliver products, and who are approved in writing by Franchisor.  Franchisee shall only utilize point of sale programmable cash registers or computer terminals, which are fully compatible with any Information Management System Franchisor, in its discretion, may employ, even if the Information Management System is not fully operational.  All sales shall be recorded on such cash registers or computer terminals.  Franchisor may require that Franchisee's cash registers or computer terminals be on-line with Franchisor's computer so that Franchisor can poll sales data daily.  The cost of all equipment required to put Franchisee's cash registers or computer terminals on-line with Franchisor's computer, including without limitation a modem and dedicated telephone line, shall be paid for by Franchisee.  If Franchisee desires to purchase any products from an unapproved supplier, Franchisee or the supplier shall submit to Franchisee a written request for approval.  Franchisee may not purchase from any supplier until the supplier has been approved in writing by Franchisor.  Franchisor has the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered either to Franchisor or to an independent laboratory designated by Franchisor for testing.  A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier.  Franchisor reserves the right, at its option, to re-inspect from time to time the facilities and products of any approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then current criteria.

L.      Franchisee acknowledges and agrees that Franchisor may develop for use in the Chicken Kitchen System products made from confidential secret recipes and formulae that are trade secrets of Franchisor.  Franchisee agrees that, if any proprietary products are or become a part of the Chicken Kitchen System, Franchisee will use only Franchisor's secret recipe products and shall purchase from Franchisor or from a source designated by Franchisor all of Franchisee's requirements of the products.  Currently, the only propriety product is the marinated chicken.  Franchisee agrees not to, nor to permit anyone to, analyze or in any way reproduce or sell the marinated chicken, and further agrees to use the marinated chicken only in the Franchise Business and in the manner prescribed by Franchisor.

M.      Franchisee shall maintain the Franchise Business in the highest degree of sanitation and repair, and will make any additions, alterations, repairs and replacements (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, periodic repairs to or repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct.

CHICKEN KITCHEN FRANCHISE AGREEMENT

N.      At Franchisor's request, which shall not be more often than once every 5 years, Franchisee agrees to refurbish the Franchise Business at Franchisee's expense to conform to the building design, trade dress, color schemes and presentation of trademarks and service marks then specified by Franchisor as the current image of restaurants under the Chicken Kitchen System. Refurbishing may include, without limitation, structural changes, replacement of worn out or obsolete fixtures, equipment and signs, the substitution of addition of new or improved fixtures, equipment and signs, redecorating, alteration of the store front and modification of the design and layout. Refurbishing will be commenced and completed within the reasonable time specified by Franchisor.

O.      Franchisor and its representative shall have the unrestricted right to enter the Franchise Business and conduct such inspections as it deems necessary to ascertain if Franchisee is complying with this Agreement and the standards, specifications and procedures prescribed by Franchisor. The inspections may be conducted without notice at any time when Franchisee or an employee of Franchisee is at the Franchise Business. Franchisor agrees to perform the inspections in a manner that minimizes interference with the operation of the Franchise Business. Franchisee agrees to cooperate with Franchisor and its representatives in the inspections by rendering any assistance reasonably requested. Upon written notice from Franchisor or its representatives, and without limiting Franchisor's other rights under this Agreement, Franchisee shall correct such reasonable deficiencies detected during any such inspection within 30 days, including, without limitation, discontinuing further use of any equipment, advertising materials, products, ingredients, supplies or other items that do not conform to Franchisor's then current specifications, standards or requirements.

P.      Franchisee acknowledges that the development and sale of new or modified products for use in the Chicken Kitchen System shall be controlled by Franchisor, in its sole discretion, during the research, market testing and rollout stages of development. Franchisee shall be authorized to sell new or modified products only after the products have been approved by Franchisor for general use in the Chicken Kitchen System.

Q.      Franchisee shall substantially comply with all other reasonable requirements set forth in this Agreement and the MOP.

## VIII.   PROPRIETARY MARKS

A.      Franchisor represents with respect to the Proprietary Marks that Franchisor has the right to establish and operate, and the right to license others to establish and operate, restaurants using the Chicken Kitchen System and Proprietary Marks.

B.      With respect to Franchisee's use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

1.   Franchisee shall use only the Proprietary Marks designated by Franchisor, and shall use them only in the manner specified by Franchisor.

2.   Franchisee shall use the Proprietary Marks only for the operation of the Franchise Business.

3.   Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Franchise Business only under the name CHICKEN KITCHEN, without any prefix or suffix. Franchisee may not use the Proprietary Marks as part of any corporate or other legal name.

4.   During the term of this Agreement and any renewal, Franchisee will indicate, in the manner specified by Franchisor, that the Franchise Business is independently owned and operated under a franchise in a notice posted in the Franchise Business and on invoices, order forms, receipts, checks and contracts.

5.   Franchisee may use the Proprietary Marks only for the purposes and in the manner authorized in this Agreement. Any other use of the Proprietary Marks shall constitute an infringement of Franchisor's rights.

6.   Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor.

7.   Franchisee shall comply with Franchisor's instructions in filing and maintaining any requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

8.   Franchisee agrees not to do anything, which could adversely affect Franchisor's ownership of the Proprietary Marks, and to immediately notify Franchisor of any infringement or imitations and any challenges to Franchisee's use of any of the Proprietary Marks. Franchisor has sole discretion as to what action, if any, should be taken. Franchisee agrees to cooperate with Franchisor in preventing the infringement, imitation, or misuse of any of the Proprietary Marks and agrees to be named as a party in any legal action if requested by Franchisor. The legal expenses incident to Franchisee's participation in a proceeding at Franchisor's request shall be paid by Franchisor.

C.   Franchisee understands and acknowledges that:

1.   Franchisor is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

2.   The Proprietary Marks are valid and serve to identify the Chicken Kitchen System and those who are authorized to operate under the Chicken Kitchen System.

3.   Franchisee shall not directly or indirectly contest the validity or Franchisor's ownership of the Proprietary Marks.

4.   Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the license to use the marks granted by this Agreement.

5.   All goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to Franchisor's benefit; and, upon expiration or termination of this Agreement and the license granted, the goodwill associated with Franchisee's use of the Chicken Kitchen System and the Proprietary Marks will have no monetary value.

6.   The right and license of the Proprietary Marks granted to Franchisee is non-exclusive, and Franchisor has and retains the right to:

a.   Use the Proprietary Marks itself in connection with selling products and services.

b.   Grant other licenses to third parties giving them the right to use the Proprietary Mark.

c.   Develop and establish other systems using the Proprietary Marks or similar marks, or any other proprietary marks, and to grant licenses to use the marks outside the protected area without any obligation to offer a license to Franchisee.

7.   Franchisor has the right to substitute different propriety marks for use in identifying restaurants operating under the Chicken Kitchen System if any of the Proprietary Marks can no longer be used or if, in the sole discretion of Franchisor, it becomes advisable at any time to modify or discontinue the use of any of the Proprietary Marks, including CHICKEN KITCHEN, and/or use one or more additional or substitute names or marks. Upon notification from Franchisor, Franchisee shall promptly discontinue the use of any Proprietary Mark, and Franchisor's liability to Franchisee shall be limited to reimbursing Franchisee for the unamortized cost of any signs and printed materials which must be discarded.

8.   Franchisor has the sole right to and interest in all telephone numbers and listings associated with the Proprietary Marks, and Franchisor is authorized to direct the telephone company to transfer the telephone numbers and listings relating to the Franchise Business to Franchisor or its designee should Franchisee fail or refuse to do so upon termination or expiration of this Agreement.

## IX.   CONFIDENTIAL MANUAL OF OPERATING PROCEDURES ("MOP")

A.   To protect the reputation, integrity and goodwill of the Chicken Kitchen System and to maintain uniform standards of operation, Franchisee agrees to operate the Franchise Business strictly in accordance with the provisions in the MOP. Any failure by Franchisee to comply with the MOP shall be a breach of this Agreement. Franchisee agrees to restrict access to the MOP to employees of the Franchise Business and then

CHICKEN KITCHEN FRANCHISE AGREEMENT

only to the extent necessary for the operation of the Franchise Business. Upon expiration or termination of this Agreement, Franchisee will return the MOP, together with all copies, to Franchisor.

B.     Franchisee agrees to treat the MOP, any other written materials created for or approved for use in the operation of the Franchise Business, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential. Franchisee shall not at any time copy, duplicate, record, or otherwise reproduce these confidential materials, in whole or in part, nor otherwise make any of the materials or the information contained therein available to any unauthorized person.

C.     The MOP shall remain the property of Franchisor and will at all times be kept in a secure place in the Franchise Business.

D.     Franchisee agrees that changes in the standards, specifications, and procedures will be necessary from time to time because of changing markets and competition, new laws and regulations, new products and technological developments, changing demographic factors and other conditions beyond Franchisor's control, and agrees to accept and comply with modifications which Franchisor in good faith believes to be necessary or desirable. Changes to the Chicken Kitchen System may include, without limitation, the adoption and use of new or modified trade names, trademarks, service marks or copyrighted materials, new products and/or deletion of products, new management practices, new equipment, new colors, decorations, uniforms, signs or trade fixtures, and/or new operating or production procedures.

E.     Franchisee shall keep the loaned copy of the MOP up to date. In the event of a dispute as to the contents of the MOP, the terms of the master copy of the MOP maintained by Franchisor shall be controlling.


X.     <u>CONFIDENTIAL INFORMATION</u>

A.     Franchisee agrees not to, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, association or corporation any confidential information, knowledge, or know-how concerning the methods of operation of the Franchise Business which may be communicated to Franchisee, or of which Franchisee may be apprized, by virtue of this Agreement. Franchisee shall divulge confidential information only to those employees who must have access to it in order to operate the Franchise Business. All information, knowledge, know-how and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to his attention prior to its disclosure by Franchisor or which at or after the time of disclosure by Franchisor to Franchisee becomes a part of the public domain, through publication or communication by others.

B.     Franchisee acknowledges that any failure to comply with the requirements of this Section X will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Section X.


XI. <u>ACCOUNTING AND RECORDS</u>

A.     Franchisee agrees to maintain during the term of this Agreement, and shall preserve for at least 3 years from the end of the year to which they relate, complete and accurate books, records and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor in the MOP or otherwise in writing. These records shall include, without limitation, accounting records and books, customer files, sales and purchase records, sales tax records, deposit tickets, bank statements, canceled checks and business tax returns.

B.     No later than the 20th day of each month, Franchisee shall submit to Franchisor, in a format specified by Franchisor, a monthly (for previous month) and fiscal year to date profit and loss statement. Within 30 days after the end of each calendar quarter, Franchisee shall furnish Franchisor with a quarterly balance sheet for the Franchise Business. Franchisee shall submit to Franchisor copies of all state and local sales tax returns for the Franchise Business at the same time as the originals are filed with the taxing authority.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

C.      Franchisee shall also submit to Franchisor such other forms, reports, records, information, cash register "Z" tapes, daily management reports and any other data specified in the MOP or requested by Franchisor.

D.      Franchisor or its representatives shall have the right at all reasonable times to examine and copy, at Franchisor's expense, the books, records and tax returns of the Franchise Business. Franchisor shall also have the right, at any time, to have an independent audit made of the books of the Franchise Business. If an inspection discloses that sales have been understated in any report to Franchisor, Franchisee shall immediately pay to Franchisor the Royalty and Advertising Fund payment deficiency plus interest from the date such payments were due until paid, at the rate of 1.5% per month, or the maximum permitted by law, whichever is less. If a discrepancy is found between reported sales and actual sales in excess of 2% of reported sales, Franchisee must reimburse Franchisor for all costs of the inspection including travel, living expenses, wages and reasonable accounting and legal costs. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

## XII. ADVERTISING

Recognizing the value of advertising, sales promotion, and the importance of standardization of advertising programs to the furtherance of the goodwill and public image of the Chicken Kitchen System, franchisee agrees to the following:

A.      All advertising by Franchisee in any medium, which utilizes the Proprietary Marks or refers in any way to the Chicken Kitchen restaurant shall be conducted in a dignified manner and shall conform to such standards and requirements as Franchisor may specify from time to time in writing. Franchisee shall submit to Franchisor (in accordance with the notice provisions contained herein), for Franchisor's prior approval (except with respect to prices to be charged), samples of all advertising and promotional plans and materials that Franchisee desires to use, that use the Proprietary Marks or refer to the Chicken Kitchen restaurant and that have not been prepared or previously approved by Franchisor. If written disapproval thereof is not received by Franchisee within fifteen (15) days from date of receipt by Franchisor of such materials, Franchisor shall be deemed to have given the required approval. Upon notice from Franchisor, Franchisee shall discontinue and/or remove any objectionable advertising material, whether or not same was previously approved by Franchisor. If said materials are not discontinued and/or removed within five (5) days after notice, Franchisor or its authorized agents, may, at any time, enter upon Franchisor's premises, or elsewhere, and remove any objectionable signs or advertising media and may keep or destroy such signs or other media without paying therefore, and without being guilty of trespass or other tort.

B.      Every 3 months during the term of this Agreement, Franchisee shall spend on local advertising not less than 1.25% of Gross Sales, contribute 2% of Gross Sales to the Franchisor-approved Advertising Cooperative (if none exists Franchisee is required to spend the 2% to local advertising, and .75% to the Chicken Kitchen Advertising Fund.  In no event will Franchisee's required advertising expenditures, in the aggregate (including local advertising expenditures and payments to the Advertising Fund) exceed 4% of Gross Sales. The amount Franchisee may spend on local advertising is not limited by this Agreement. Franchisee may voluntarily spend on local advertising in excess of the required amount. Franchisee shall provide Franchisor with receipts for all local advertising expenditures not later than the 20th day following the end of each calendar quarter for advertising expenditures incurred in that quarter. If the submitted receipts do not document that Franchisee made the required local advertising expenditures in any calendar quarter, Franchisee shall pay to Franchisor an amount equal to the deficiency for inclusion in the Chicken Kitchen Advertising Fund.

C.      All advertising and promotion by Franchisee shall be conducted in a dignified manner and shall conform to the standards and requirements specified by Franchisor. Franchisee shall submit to Franchisor, for its prior approval (except with respect to prices to be charged), samples of all advertising and promotional plans and materials that Franchisee desires to use and which have not been furnished by or previously approved by Franchisor. If written disapproval is not received by Franchisee within 15 days after the date of receipt by Franchisor of the samples and request for approval, Franchisee may use the proposed advertising and promotional materials.  Franchisor may at any time disapprove advertising and promotional materials, and following disapproval, Franchisee shall not use the materials.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

D.       The Franchise Business shall be listed in the Yellow Pages of the local telephone directory under the headings "Restaurants" and "Catering Services", and if requested by Franchisor, the Franchise Business shall be included in a joint listing with other restaurants in the Chicken Kitchen System. The cost of the listing shall be paid by Franchisee, or on a pro rata basis by all participating restaurants in the case of a joint listing. The format, size and content of the listing must conform to the standards established by Franchisor. Franchisor shall not specify an unreasonably expensive listing. The cost of the listing shall not qualify as an advertising expenditure for purposes of satisfying Franchisee's local advertising expenditure requirement.

E.       Franchisee may sell products at prices Franchisee may determine, and shall in no way be bound by any price, which may be recommended or suggested by Franchisor.

F.       Franchisee shall pay into the Advertising Fund a recurring non-refundable Advertising Fund fee of .75% of Gross Sales. The Advertising Fund shall be administered by Franchisor under the following conditions and limitations:

1.    All reasonable costs incurred by Franchisor or charged to Franchisor by third parties for the production and dissemination of advertising and promotion materials may be charged to the Advertising Fund.

2.    Franchisor, upon request, will provide Franchisee with an annual accounting of receipts and disbursements of the Advertising Fund.

3.    Selection of media and locale for media placement shall be at the sole discretion of Franchisor.

4.    The Advertising Fund shall be used exclusively to meet the costs of maintaining, administering, directing and preparing advertising and/or promotional and public relations and market research activities. Franchisee shall contribute to the Advertising Fund by separate check made payable to the Chicken Kitchen Advertising Fund. All sums paid by Franchisee to the Advertising Fund shall be maintained in a separate account and shall not be used to defray any of Franchisor's expenses, except those costs reasonably related to the administration of the Advertising Fund and advertising programs for franchisees and the Chicken Kitchen System.

5.    It is anticipated that contributions to the Advertising Fund will be expended for advertising and promotional purposes during the fiscal year within which the contributions are made; however, if any funds are not spent in the year received, they will be spent in the following year.

6.    The Advertising Fund is not, and shall not be deemed, an asset of Franchisor. Although the Advertising Fund is intended to be of perpetual duration, Franchisor has the right to terminate or suspend the Advertising Fund or reduce Franchisee's obligation to make payments into the Advertising Fund and instead direct Franchisee to spend the payment on approved local advertising. Franchisor may revoke such direction at any time and upon revocation Franchisee shall resume making payments into the Advertising Fund. The Advertising Fund shall not be terminated until all monies in the Advertising Fund have been expended for advertising or promotional purposes.

7.    Franchisee acknowledges that the Advertising Fund is intended to increase the public's awareness of the Chicken Kitchen System and Proprietary Marks and increase patronage of Chicken Kitchen Restaurants. Although Franchisor will endeavor to utilize the Advertising Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all Chicken Kitchen Restaurants, Franchisor has no obligation in administering the Advertising Fund to ensure that expenditures by the Advertising Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Advertising Fund by Chicken Kitchen Restaurants open in that geographic area or than Franchisee will receive a direct benefit which is equivalent or proportionate to the amount paid into the Advertising Fund by Franchisee.

G. Pursuant to Section IV.D, in the event that either a regional advertising fund or regional advertising cooperative, approved by Franchisor, is established for the Franchise Business' market, Franchisee shall become a member of and make payment to the advertising cooperative in the amount determined by a majority of the members. Payments to a local or regional advertising cooperative may be used to satisfy Franchisee's required local advertising obligation, but will not affect Franchisee's obligation to contribute to the Advertising Fund.

CHICKEN KITCHEN FRANCHISE AGREEMENT

## XIII. INSURANCE

A.    Throughout the term of this Agreement, including during construction, Franchisee shall maintain in full force, at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense arising or occurring upon or in connection with the Franchise Business, including all vehicles used in the business, whether owned by Franchisee, an employee of Franchisee or an independent contractor used by Franchisee to provide delivery services.

B.    The policy or policies shall be written by an insurance company licensed in the state where the Franchise Business is located and be acceptable to Franchisor, and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified for all franchisees by Franchisor from time to time) the following:

1.    Comprehensive or commercial general liability insurance, including personal injury, completed operations, contractual liability, property damage, products liability, liquor liability and fire damage coverage, as well as comprehensive automobile liability coverage for both owned and non-owned vehicles, in the amount of not less than $ 1,000,000.00 per occurrence for bodily injury and not less than $500,000 for property damage.

2.    All risk property insurance in an amount sufficient to cover the cost of replacement (without deduction for depreciation) covering the Franchise Business premises and its furniture, fixtures and equipment.

3.    Comprehensive and collision insurance covering damage to every vehicle used in the business in the amount of the actual cash value of the vehicle. Personal injury protection for the drivers and passengers in vehicles used in the business.

4.    Business interruption insurance.

5.    Employer's liability, workers' compensation and such other insurance required by law where the Franchise Business is located.

C.    Franchisor may require additional coverage and/or higher policy limits as may be reasonably required by good business practices.

D.    Franchisee's obligation to obtain and maintain the foregoing insurance shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve Franchisee of liability under the indemnity provisions set forth in Section XXIX.C.

. E.    Prior to commencing construction and prior to the opening of the Franchise Business and at least 10 days prior to the expiration of any policy, Franchisee shall deliver to Franchisor a certificate of insurance reflecting that the insurance coverage is in effect, and upon request, a copy of the policy or policies. Each policy shall provide that the policy cannot be canceled or materially modified without 30 days prior written notice to Franchisor.

## XIV.    TRANSFER OF INTEREST

A.    <u>Transfer by Franchisor</u>

Franchisor may transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity.

B.    <u>Transfer by Franchisee</u>

1.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and are granted in reliance on Franchisee's business skill, financial capacity and personal character. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, corporation or other

# CHICKEN KITCHEN FRANCHISE AGREEMENT

legal entity which directly or indirectly owns any interest in this Agreement or in Franchisee, shall sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in Franchisee, this Agreement, the Franchise Business, or the assets of the Franchise Business without the prior written consent of Franchisor, which consent may not be unreasonably withheld at Franchisor's sole discretion; provided, however, subject to the secured party complying with the provisions of Section XIV.B.3, Franchisor's prior written consent shall not be required for the granting of a security interest in the furniture, fixtures and equipment used in the Franchise Business to a financial institution providing financing for the initial purchase of these assets. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section XIV.B.1 shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement without any opportunity to cure pursuant to Section XV.B.4.

    2. If a transfer, alone or together with other previous, simultaneous or proposed transfers, would result in a change or potential change of control of Franchisee, or the ownership of this Agreement, the Franchise Business or substantially all of the assets of the Franchise Business, Franchisor may require, in its sole discretion, any or all of the following as conditions of its approval:

    a.    All of Franchisee's accrued monetary obligations to Franchisor and any subsidiary or affiliate of Franchisor have been satisfied.

    b.    Franchisee is not in default of any provision of this Agreement or any other agreement between Franchisee and Franchisor or an affiliate or subsidiary.

    c.    The transferor executes a general release, in a form satisfactory to Franchisor, of all claims, to the maximum extent allowed by law, against Franchisor and its officers, directors, shareholders, agents and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules and regulations.

    d.    The transferee (and, if transferee is not an individual, such owners of a beneficial interest in the transferee as Franchisor may request) enters into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement.

    e.    The transferee demonstrates to Franchisor that transferee meets Franchisor's managerial and business standards, is of good moral character, has a good business reputation and credit rating, has satisfactory business experience, has adequate financial resources and capital, and successfully completes Franchisor's management training program.

    f.    Transferor shall remain liable for all obligations of Franchisee under this Agreement until such time as transferee has paid in full all debt incurred by transferee in connection with the assignment or transfer and shall execute all instruments reasonably requested by Franchisor to evidence this continuing liability.

    g.    Except in the case of a transfer to a corporation formed for the convenience of ownership, a transfer fee in the amount of $5,000, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing and processing the transfer request and providing training to the transferee.

    3.    Franchisee shall not grant a security interest in any of the assets of the Franchise Business unless the secured party agrees that, in the event of a default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option to purchase the rights of the secured party upon payment of all sums then due to the secured party directly related to the Franchise Business.

    4.    Franchisee acknowledges and agrees that each condition, which must be met by a transferee, is reasonable and necessary to protect the integrity of the Chicken Kitchen System.

C.    Offerings by Franchisee

    Securities or partnership interests in Franchisee may be offered to the public, by private offering or otherwise, only with the prior written consent of Franchisor (whether or not Franchisor's consent is required under Section XIV.B.), which consent shall not be unreasonably withheld. All materials required for any offering of securities of Franchisee by federal or state law shall be submitted to

## CHICKEN KITCHEN FRANCHISE AGREEMENT

Franchisor for review prior to their being filed with any government agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use. No offering of securities shall imply (by use of any of the Proprietary Marks or otherwise) that Franchisor is participating in the underwriting, issuance or offering of securities by Franchisee; and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering, and must prior to the offering execute all documents requested by Franchisor to evidence this indemnification. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of $10,000.00, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice, together with a copy of all documentation pertaining to the proposed offering, at least 30 days prior to the date of commencement of any offering or other transaction covered by this Section XIV.C.

D.   Right of Refusal

1.   Any party holding an interest in Franchisee, this Agreement or the assets of the Franchise Business, who desires to accept a bona fide offer from a third party to purchase such interest, shall notify Franchisor in writing of each offer, and shall provide such information and documentation relating to the offer as Franchisor may request. Franchisor or its designee shall have the right and option, exercisable within 30 days after receipt of the written notification and requested documentation, to send written notice to the seller that Franchisor or its designee intends to purchase the seller's interest on the same terms and conditions offered by the third party. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by Franchisor or its designee as in the case of the initial offer. Failure by Franchisor to exercise the option afforded by this Section XIV.D. shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of Section XIV with respect to a proposed transfer by Franchisee. If Franchisor does not exercise its first right to purchase, the seller may conclude the sale to the person who made the offer on the exact terms and conditions specified in the notice to Franchisor for a period of 60 days after receipt of Franchisor's consent to the assignment.

2.   If the consideration, terms, and/or conditions offered by the third party are such that Franchisor or its designee may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor or its designee may purchase the interest proposed to be sold for the reasonable equivalent in cash, or, at the option of Franchisor, if the stock of Franchisor or its designee is publicly traded, securities issued by Franchisor or its designee having a liquid market value equal to the offered consideration. If the parties cannot agree within a reasonable time on the value of the offer, an independent appraiser shall be designated by Franchisor and the appraiser's determination shall be binding.

E.   Transfer Upon Death or Mental Incapacity

Upon the death or mental incapacity of any person with an interest in this Agreement, the Franchise Business or Franchisee, the executor, administrator or personal representative of such person shall transfer, within 6 months after such death or mental incapacity, the interest of the person to a third party approved by Franchisor. Such transfer shall be subject to the same conditions as any inter-vivos transfer pursuant to this Section XIV. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of such person are unable to meet the conditions in this Section XIV, the personal representative of the deceased shall have a reasonable additional time to dispose of the deceased's interest in this Agreement. If the interest is not disposed of within a reasonable time, Franchisor may terminate this Agreement

F   Non-Waiver of Claims

CHICKEN KITCHEN FRANCHISE AGREEMENT

Franchisor's consent to a transfer of an interest in this Agreement shall not constitute a waiver of any claims Franchisor may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with the terms of this Agreement by the transferee.

## XV.   DEFAULT AND TERMINATION

A.      Franchisee shall be deemed in default under this Agreement, and all rights granted in this Agreement shall automatically terminate without notice to Franchisee, if Franchisee becomes insolvent or makes an assignment for the benefit of creditors; if Franchisee files a petition or application seeking any type of relief under the U.S. Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have Franchisee adjudicated a bankrupt, or seeking other relief against Franchisee under the U.S. Bankruptcy Code or any state insolvency or similar law and the petition or application is not dismissed within 60 days; if Franchisee is adjudicated as bankrupt or insolvent; if a receiver or other custodian (permanent or temporary) of Franchisee's assets, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law are instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for 30 days or longer (unless bonded); if Franchisee is dissolved; if execution is levied against a material portion of Franchisee's business or property; or if the real or personal property of the Franchise Business is sold after levy.

B.      Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted under the Agreement, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

1.      If Franchisee fails to construct and open the Franchise Business in accordance with Section V and/or the Site Selection Addendum of this Agreement.

2.      If Franchisee at any time ceases to operate or otherwise abandons the Franchise Business, or loses the right to possession of the premises of the Franchise Business, or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise Business is located; provided, however, that if any loss of possession results from the governmental exercise of the power of eminent domain or if, through no fault of Franchisee, the premises are damaged or destroyed, then Franchisee shall have 30 days after such event in which to apply for Franchisor's approval to relocate or reconstruct the premises, which approval shall not be unreasonably withheld.

3.      If Franchisee, or any officer, director, controlling shareholder, partner of Franchisee, is convicted of a felony, a crime involving moral turpitude or any other crime that Franchisor believes is reasonably likely to have an adverse effect on the Chicken Kitchen System, the Proprietary Marks or the goodwill associated with the Chicken Kitchen System or the Proprietary Marks.

4.      If Franchisee or any partner or shareholder in Franchisee transfers, or attempts to transfer, any rights or obligations under this Agreement or any interest in Franchisee to any third party without Franchisor's prior written consent, contrary to the terms of Section XIV of this Agreement.

5.      If Franchisee fails to comply with the covenants in Sections XVII.B. or XVII.C., or fails to obtain execution of the covenants required under Section XVII.J.

6.      If, contrary to the terms of Section IX or X, Franchisee discloses or divulges the contents of the MOP or other confidential information provided to Franchisee by Franchisor.

7.      If an approved transfer is not effected following Franchisee's death or mental incapacity within the time specified in Section XIV.

8.      If Franchisee knowingly maintains false books or records, or submits a false report to Franchisor.

9.      If Franchisee, after curing a default pursuant to Section XV.C commits the same act of default within the next 6 months.

10.     If Franchisee defaults more than three times in any 12 month period under Section XV.C. for failure to comply with the requirements imposed by this Agreement, whether or nor cured after notice.

C.      Except as provided in Sections XV.A. and XV.B., Franchisee shall have 30 days, unless a shorter time is specified, after receipt of written notice from Franchisor within which to remedy any default. If any default is not cured within that time, or such longer period as applicable law may require, this Agreement shall

CHICKEN KITCHEN FRANCHISE AGREEMENT

terminate without further notice to Franchisee effective immediately upon expiration of the cure period. Franchisee shall be in default under this Agreement for any failure to comply with any provision of this Agreement or to carry out the terms of this Agreement in good faith. Such defaults shall include, without limitation, the occurrence of any of the following events:

1.   If Franchisee does not pay any monies owed to Franchisor or its affiliates when due, or fails to submit the sales or financial reports required by Franchisor under this Agreement. Franchisee shall have 10 days after receipt of written notice of termination from Franchisor to cure a default in the payment of monies or submission of sales or financial reports.

2.   If Franchisee fails to maintain any of the standards or procedures prescribed by Franchisor in this Agreement, the MOP, or otherwise in writing.

3.   Except as provided in Section XV.B, if Franchisee fails to obtain Franchisor's prior written approval or consent as required under this Agreement.

4.   If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise impairs the goodwill associated with the Proprietary Marks.

5.   If Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to any of the Proprietary Marks.

6.   If Franchisee, by act or omission, permits a continued violation in connection with the operation of the Franchise Business of any law, ordinance, rule, or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administrative or judicial forum for relief therefrom.

7.   If Franchisee is declared to be in default under any mortgage, lease, deed of trust, or loan relating to the Franchise Business.

8.   If a threat or danger to public health or safety results from the construction, maintenance or operation of the Franchise Business.

## XVI.   OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted to Franchisee shall terminate and:

A.      Franchisee shall immediately cease to operate the Franchise Business, and shall not thereafter, directly or indirectly, represent to the public that the restaurant is associated with the Chicken Kitchen System or hold himself out as a present or former franchisee of Franchisor.

B.      Franchisee shall immediately and permanently cease to use, in any manner, any menus, recipes, confidential methods, procedures and techniques associated with the Chicken Kitchen System and the Proprietary Marks. In particular, Franchisee shall cease to use, without limitation, the proprietary marinated chicken or marinade mix, and all signs, advertising materials, displays, stationery, forms and any other materials which display any of the Proprietary Marks; provided, however, that this Section XV.B. shall not apply to the operation by Franchisee of any other restaurant under the Chicken Kitchen System pursuant to a franchise granted by Franchisor to Franchisee.

E.      Franchisee shall take appropriate action to cancel any assumed or fictitious name registration, which contains any of the Proprietary Marks, and Franchisee shall furnish Franchisor with evidence of compliance within 30 days after termination or expiration of this Agreement.

F.      Franchisee shall, at Franchisor's option, assign to Franchisor or its designee Franchisee's interest in any lease or sublease for the premises of the Franchise Business. If Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Franchise Business, Franchisee shall promptly after termination or expiration of this Agreement, make such modifications or alterations to the premises as may be necessary to distinguish the appearance of the premises from its former appearance and that of other restaurants operating under the Chicken Kitchen System. If Franchisee fails or refuses to comply with the requirements of this Section XVI, Franchisor may enter upon the premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made the required changes, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

G.      Franchisee agrees, in the event it continues to operate or subsequently begins to operate a restaurant or other business, not to use any reproduction, counterfeit, copy, or colorable imitation of any of the

## CHICKEN KITCHEN FRANCHISE AGREEMENT

Proprietary Marks in connection with the operation of, or promotion of, such restaurant or other business which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any trade dress designation of origin, description or representation which falsely suggests or represents an association or connection with Franchisor or the Chicken Kitchen System.

    H.      Franchisee shall immediately pay all sums owing to Franchisor and its subsidiaries and affiliates. In the event of termination because of a default by Franchisee, these sums shall include all damages, costs and expenses, including reasonable attorneys fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against all personal property, furnishings, equipment, signs, fixtures and inventory owned by Franchisee located on the premises of the Franchise Business at the time of default.

    I.      Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorneys fees incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provision of this Section XVI.

    J.      Franchisee shall immediately deliver to Franchisor the MOP and such other records, files, instructions, correspondence and materials, which are confidential and are related to operating the Franchise Business and/or to the Chicken Kitchen System.

    K.      Franchisor shall have the option, exercisable within 30 days after termination or expiration, to purchase from Franchisee the furnishings, equipment, signs, fixtures, supplies, inventory and other tangible assets of the Franchise Business at fair market value. If the parties are unable to agree on the fair market value within a reasonable time, an independent appraiser shall be designated by Franchisor, which appraiser's determination shall be binding. Franchisor shall receive a credit against the purchase price for any sums, which are owed to it or a subsidiary or affiliate by Franchisee, the cost of the appraisal, if any, and for any monies, which Franchisor expends for obligations of Franchisee. Upon payment of the purchase price, Franchisee shall deliver to Franchisor or its designee a bill of sale conveying title to the property free and clear of all encumbrances, and such other documents reasonably required to effect a complete transfer of Franchisee's right, title, and interest in the assets. Franchisee shall ensure that notice is given to all creditors pursuant to the applicable bulk transfer laws of the state where the Franchise Business was located, and shall hold Franchisor harmless from any and all claims of Franchisee's creditors.

    L.      If Franchisee occupies the premises as a fee owner, Franchisee shall give Franchisor the option of buying or leasing the premises at its fair market value. In the event that Franchisor chooses to lease the premises, the term of the lease shall be for a period of 20 years.

    M.      Franchisee shall comply with the covenants contained in Section XVII.C.

## XVII. <u>COVENANTS</u>

    A.      Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall devote full time, energy and best efforts to the management and day-to-day operation of the Franchise Business but may operate other restaurant entities as approved by Franchisor which approval will not be unreasonably withheld.

    B.      Franchisee acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operation, sales, promotional and marketing methods and techniques of Franchisor and the Chicken Kitchen System. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for himself, or through, on behalf of, or in conjunction with, any person, persons or legal entity.

    1.      Divert or attempt to divert any business or customer or potential customer of the Franchise Business to any competitor, by direct or indirect inducement, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the Chicken Kitchen System.

    2.      Employ or seek to employ any person who is at that time employed by Franchisor or by another franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment, unless such employment is accomplished with the written consent of the person's employer.

## CHICKEN KITCHEN FRANCHISE AGREEMENT

3.   Own, maintain, advise, help, invest in, make loans to, engage in or have any interest in any food service business which fifty percent of its business is the selling or distribution of chicken.

C.       Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, or upon the transfer of Franchisee's interest in this Agreement, and continuing for 2 years, either directly or indirectly, for himself, or through, on behalf of, or in conjunction with any person, persons or legal entity, own, maintain, operate, engage in, be employed by or have any interest in any food service business which sells or distributes chicken within 5 miles of the Franchise Business or any Chicken Kitchen Restaurant open or under construction on the date this Agreement expires or terminates or Franchisee's interest in this Agreement is transferred.

D.       Section XVII.C shall not apply to the ownership by Franchisee of less that 5% beneficial interest in the outstanding equity securities of any company registered under the Securities Exchange Act of 1934.

E.       The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section XVII is held unreasonable or unenforceable by a court having valid jurisdiction in a final decision to which Franchisor is a party, Franchisee expressly agrees that the provision shall be deemed amended so that it is enforceable to the maximum extent permitted by law and pubic policy, as if the resulting covenant were separately stated in and made a part of this Section XVII.

F.       Franchisee understands and acknowledges that Franchisor shall have the right in its good faith judgment, to reasonably increase the scope of any covenant set forth in Sections XVII.B and XVII.C, without Franchisor's consent, effective immediately upon written notice from Franchisor; and Franchisee agrees to comply with any modified covenant, which shall be fully enforceable notwithstanding the provisions of Section XXI

G.       Franchisee acknowledges that the Chicken Kitchen System and the information, whether oral or written, disclosed to Franchisee by Franchisor pursuant to this Agreement, have been developed by Franchisor at considerable cost and expense and are disclosed to Franchisee in the strictest confidence. Accordingly, Franchisee covenants and agrees the neither Franchisee nor any of its directors, officers, shareholders, partners, members or key employees will, otherwise than in accordance with the terms of this Agreement, either during the term of this Agreement or at any time thereafter, anywhere in the world, make use of or disclose any confidential information with respect to the Chicken Kitchen System, nor will they, for their own purposes or any other purposes whatsoever, disclose to anyone any confidential information or knowledge they may acquire with respect to Franchisor's affairs. Furthermore, Franchisee acknowledges and will require its directors, officers, shareholders, partners, members and key employees to acknowledge that they do not have any rights or claims of any kind or nature in or to any element of the Chicken Kitchen System or the Proprietary Marks.

H.       Franchisee agrees to pay all costs and expenses, including reasonable attorneys fees, incurred by Franchisor in connection with the enforcement of this Section XVII.

I.       Franchisee acknowledges that Franchisee's violation of the terms of this Section XVII would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction, without the posting of a bond, prohibiting any conduct by Franchisee in violation of this Section XVII.

J.       Franchisee shall obtain covenants similar to those set forth in this Section XVII (including covenants applicable upon the termination of a person's relationship with Franchisee) from all managers and head cooks of Franchisee prior to granting such employees access to any confidential aspect of the Chicken Kitchen System or the Franchise Business, and all officers, directors and holders of a direct or indirect beneficial ownership interest of 5% or more in Franchisee. All covenants required by this Section XVII shall be in a form satisfactory to Franchisor, including, without Stations specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. A duplicate original of each covenant shall be sent to Franchisor upon execution. Failure by Franchisee to obtain execution of a covenant required by this Section XVII.J shall constitute a material breach of this Agreement.

## XVIII.  TAXES, PERMITS, AND INDEBTEDNESS

## CHICKEN KITCHEN FRANCHISE AGREEMENT

A.      Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitations, sales, F.I.C.A. and unemployment taxes, and all accounts and other indebtedness incurred by Franchisee in the ownership and operation of the Franchise Business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement.

B.      In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy, execution or warrant, or attachment by a creditor, to occur against the premises of the Franchise Business, or any improvements or personal property used in the operation of the Franchise Business.

C.      Franchisee shall comply with all federal, state and local laws, rules, and regulations, and shall timely obtain all permits, certificates or licenses necessary for the operation of the Franchise Business, including, without limitation, licenses to do business, fictitious name registrations, sales tax permit, building, health, occupancy, fire and sanitation clearances.

D.      Franchisee shall notify Franchisor in writing within 5 days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchise Business.

## XIX.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.      It is understood and agreed by the parties that this Agreement does not create a fiduciary relationship between them; that Franchisee is an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, employer, joint employer, enterprise or servant of the other for any purpose.

B.      During the term of this Agreement and any extension, Franchisee shall hold himself out to the public as an independent contractor operating the Franchise Business pursuant to a license from Franchisor.

C.      Franchisee has no right to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; Franchisor does not assume liability for, and shall not be deemed liable as a result of, any action by Franchisee; Franchisor is not liable by reason of any act or omission of Franchisee in Franchisee's ownership or operation of the Franchise Business or for any claim or judgment arising from the operation of the Franchise Business. Franchisee agrees to indemnify and hold Franchisor harmless against all claims arising directly or indirectly from, or as a result of, or in connection with, Franchisee's operation of the Franchise Business, and the costs, including attorneys fees, of defending against any claim.

## XX.    APPROVALS AND WAIVERS

A.      Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor, and such approval or consent must be in writing.

B.      Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee or any third party to whom Franchisor would not be otherwise liable by providing any waiver, approval, consent or suggestion or by reason of any neglect, delay or denial of a request.

C.      No failure of Franchisor to exercise any power reserved to it in this Agreement, or to insist upon compliance by Franchisee with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms of this Agreement, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement. Waiver by Franchisor of any particular default shall not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different provision; nor shall any delay, forbearance or omission of Franchisor to exercise any power or right arising out of a breach or default by Franchisee of any of the terms, provisions or covenants of this Agreement affect or impair Franchisor's rights or constitute a waiver by Franchisor of any rights under this Agreement or right to declare any subsequent breach or default.

CHICKEN KITCHEN FRANCHISE AGREEMENT

## XXI.  NOTICES

All notices required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by any means which provides a receipt for delivery to the parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:  Royal Oak Capital. LLC
Attn: Christian de Berdouaré
10800 Biscayne Blvd., #660
North Miami. Florida 33161

Notices to Franchisee:  Manresa Corporation

Attn: Frank Beguiristain

100 Edgewater Drive, #105

Coral Gables, FL 33133

## XXII.  ENTIRE AGREEMENT

This Agreement and the documents referred to in this Agreement, together with the Franchise Application. financial statement and capitalization plan submitted by Franchisee upon which Franchisor is relying in granting this franchise, constitute the entire Agreement between Franchisor and Franchisee concerning the subject matter of this Agreement, and supersede all prior negotiations, commitments, representations and agreements. Except for those permitted to be made unilaterally by Franchisor, no amendment, change. or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties in a written document signed by the parties.

## XXIII.  SEVERABILITY AND CONSTRUCTION

A.  If any provision of this Agreement may be construed in two ways, one that would make the provision illegal or unenforceable and the other which makes the provision valid and enforceable, the provision shall have the meaning that makes its enforceable. This Agreement is to be read according to its fair meaning and is not to be interpreted strictly against either party.  The parties intend that this Agreement be enforceable to fullest extent.  If any court or arbiter finds that any provision is not enforceable as written, Franchisor and Franchisee agree that the provision be amended so that it is enforceable to the fullest extent permissible under applicable law and public policy. The provisions of this Agreement are severable, and the Agreement is to be interpreted as if all invalid or unenforceable provisions were not in the Agreement and partially valid provisions shall be enforced to the extent that they are valid and enforceable.

B.  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law, which is contained within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

C.  Any provision of this Agreement which imposes an obligation after the termination or expiration of this Agreement shall continue to be binding on the parties after the termination or expiration.

D.  If Franchisee consists of more than one person, each partner shall be liable for the total performance of Franchisee regardless of his or her ownership percentage.

E.  The Introduction is a part of this Agreement.  Section captions are used for convenience and should not be construed as a limitation of the matter, which follows.  Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where applicable.

CHICKEN KITCHEN FRANCHISE AGREEMENT

## XXIV. APPLICABLE LAW

A.    This Agreement takes effect upon its acceptance and execution by Franchisor in Mami-Dade County, Florida, and shall be interpreted and construed under the laws of the State of Florida, which laws shall prevail in the event of any conflict of law; provided, however, that if any of the provisions of this Agreement would not be enforceable under the laws of the State of Florida, but would be enforceable under the laws of the state where the Franchise Business is located, then such provision shall be interpreted and construed under the laws of the state in which the Franchise Business is located. If the Franchise Business is located in a state other than Florida and the laws of that state require terms other than, or in addition to, those contained in this Agreement, this Agreement shall be deemed modified so as to comply with the laws of that state, but only to the extent necessary to prevent the invalidity of this Agreement or any of its provisions, the imposition of a fine or penalty, or the imposition of civil or criminal liability. To the extent permitted by law, Franchisee waives any provision of law, which prohibits, or makes unenforceable, any provision of this Agreement.

B.    In the event of a dispute between the parties in connection with, arising from or relating to this Agreement, including, without limitation, any claim that this Agreement or any provision is invalid or void or voidable, the parties agree to make a good faith effort to resolve the dispute through discussion and, at the request of either party, through mediation before a mutually agreeable mediator, in which event the parties shall execute a confidentiality agreement and shall split the mediator's fee. The mediator, if possible, shall be experienced in franchise related matters. If the parties are unable to agree upon a mediator, the mediator shall be selected by the American Arbitration Association.

C.    If the parties are unable to resolve their differences through discussion and mediation, they agree that the United States District Court for the Southern District of Florida and the courts of the Eleventh Judicial Circuit of the State of Florida in and for Miami-Dade County, Florida shall be the proper venue and forum in which to adjudicate any dispute under or in connection with this Agreement, and agree not to contest or challenge the jurisdiction or venue of these courts.

D.    No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall it be deemed, exclusive of any other right or remedy under this Agreement or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

E.    Nothing contained in this Agreement shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions, except any requirement for the posting of a bond, which requirement, if any, is expressly waived by Franchisee.

F.    Whenever this Agreement provides for the payment or reimbursement of attorneys' fees, such fees shall include trial and appellate fees.

G.    Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either of them.

H.    To the fullest extent permitted by law, Franchisor and Franchisee waive any right to, or claim for, any punitive or exemplary damages against the other and agree that each shall be limited to the recovery of only actual damages.

I.    All claims arising out of this Agreement or the relationship of Franchisee and Franchisor in connection with Franchisee's operation of the Franchise Business must be made within one (1) year from the occurrence of the facts giving rise to the claim.

## XXV. ACKNOWLEDGMENTS

A.    FRANCHISEE ACKNOWLEDGES THAT FRANCIHSEE HAS HAD AMPLE OPPORTUNITY TO CONSULT WITH AN ATTORNEY AND OTHER PROFESSIONAL ADVISORS AND IS ENTERING INTO THIS AGREEMENT AFTER HAVING MADE AN INDEPENDENT INVESTIGATION OF THE CHICKEN KITCHEN SYSTEM AND THE MARKET AREA IN WHICH FRANCHISEE WILL OPERATE THE FRANCHISE BUSINESS. FRANCHISEE RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES A HIGH DEGREE OF FINANCIAL RISK AND THAT ITS SUCCESS WILL BE LARGELY DEPENDENT UPON THE BUSINESS, MANAGERIAL, AND FINANCIAL CAPABILITIES OF FRANCHISEE. FRANCHISOR EXPRESSLY DISCLAIMS THE

CHICKEN KITCHEN FRANCHISE AGREEMENT

MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

      B.      FRANCHISEE ACKNOWLEDGES RECEIVING A COPY OF THE COMPLETE CHICKEN KITCHEN CORPORATION FRANCHISE AGREEMENT AT LEAST 5 BUSINESS DAYS PRIOR TO SIGNING THIS AGREEMENT. FRANCHISEE FURTHER ACKNOWLEDGES RECEIVING THE, CHICKEN KITCHEN OFFERING CIRCULAR/ DISCLOSURE DOCUMENT AT LEAST 10 BUSINESS DAYS PRIOR TO SIGNING THIS AGREEMENT OR MAKING ANY PAYMENT TO FRANCHISOR.

      C.      FRANCHISEE ACKNOWLEDGES THAT THE TERMS AND CONDITIONS OF THIS AGREEMENT MAY VARY SUBSTANTIALLY FROM THOSE CONTAINED IN FRANCHISEES WHICH FRANCHISOR HAS OR MAY GRANT IN THE FUTURE

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the day and year shown on the first page.

Franchisor:
ROYAL OAK CAPITAL LLC

By: _____
      Christian De Berdouaré, President

Franchisee:
Manresa Corporation

By: _____, president
      Frank Beguiristain

## CHICKEN KITCHEN FRANCHISE AGREEMENT

### RIDER A

### SITE SELECTION ADDENDUM

The location of the Franchise Business is Keystone Plaza, 13575 Biscayne Blvd., North Miami Beach, Florida.

Franchise acknowledges that Franchisor's approval of the location is not a guarantee, recommendation or endorsement of the location, and that the success of the Franchise Business to be operated at the location is dependent upon Franchisee's abilities as an independent businessperson.

FRANCHISOR:

ROYAL OAK CAPITAL, LLC

By: _____

Christian De Berdouaré, President

FRANCHISEE:
Manresa Corporation

By: _____ president _____

Frank Béguiristain

# CHICKEN KITCHEN FRANCHISE AGREEMENT

## RIDER B

## ADDENDUM TO AGREEMENT

This Addendum to the Chicken Kitchen Franchise Agreement by and between Royal Oak Capital, LLC (the "Franchisor") and Manresa Corporation (the "Franchisee").

To the extent any conflict between the terms and conditions of the Franchise Agreement and this Addendum the terms and conditions of this Addendum shall prevail.

## I. GRANT

A.      With respect to the Franchise location, Franchisor grants the non-exclusive license and franchise at the Keystone Plaza, 13575 Biscayne Blvd., North Miami Beach, Florida. This means that as long as this Agreement is in force, no other Chicken Kitchen franchise or Company restaurant will be allowed to be constructed and to operate within the 2 mile protected radius. The Company in no way relinquishes its right to own the Trademarks and to promote the Tradename within and without the Protected Territory.

B.      The location stated above is a Chicken Kitchen "Approved" location. As stated in Rider A, the Company does not guarantee the success of this location. If the Franchisee wishes to sell the Agreement and the Location to another entity, it must be to an approved Franchisee and the Transfer must be approved in writing with such approval or consent will not be unreasonably withheld or delayed.

C.      The Company reserves the right to sell Chicken Kitchen branded products within the Protected Territory but agrees any sale of such products will be limited to outlets that do not directly or indirectly compete with the Franchisee.

## II. TERMS AND RENEWAL

2.      If Franchisee has remodeled within the last five (5) years of the Franchise Agreement and the condition of the restaurant meets the then current standards of the Company, Franchisee will not be required to renovate. Franchisee must submit in the request for renewal approval to delay the remodel till such time it is commercially necessary to renovate. The Company will determine at that time to grant the delay and such grant will not be unreasonably withheld.

4.      The term "timely" refers to a time period of 30 days unless otherwise noted in the Franchise Agreement.

5.      The Right to Renew should not be limited by the term of the Lease.

## IV. FEES

F.      Payments will be overdue if not paid within ten (10) days of due date. Interest will begin to accrue from due date if payment is not made within thirty (30) days.

## V. CONSTRUCTION

C. The six (6) month deadline for construction occurs 6 months after the restaurant site is delivered to Franchisee by Landlord.

E. Franchisor's right to prevent Franchisee from opening based on any non-approved variation or alteration to the approved plans applies only to "material" variations or alterations.

## VII. DUTIES OF FRANCHISEE

# CHICKEN KITCHEN FRANCHISE AGREEMENT

A. The requirement for approval is applicable only to the transfer or any assignment that represents the reduction of Frank Beguiristain's ownership to less than 51% of the voting stock.

5. The requirement for shareholder agreement is limited to the provisions restricting assignment of stock and not serve as a guarantee of performance. The guarantee of performance must always be within the scope of Frank Beguiristain.

## VIII. PROPRIETARY MARKS

C.        6. Franchisor will not license others to use the Marks within the Protected Area.

## XII. ADVERTISING

G. The Regional Advertising Co-op is for all restaurants operating within the Miami-Dade and Broward Counties.

## XIV. TRANSFER OF INTEREST

A. Franchisor's right to assign and transfer shall be subject to and shall not affect the rights of Franchisee hereunder nor shall any such assignments serve to release Franchisor of any of its obligations hereunder.

B.        1. Within the following portion of the paragraph, the words financial institution shall mean "any creditor": "provided, however, subject to the secured party complying with the provisions of Section XIV.B.3, Franchisor's prior written consent shall not be required for the granting of a security interest in the furniture, fixtures and equipment used in the Franchise Business to a financial institution providing financing for the initial purchase of these assets. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section XIV.B.1 shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement without any opportunity to cure pursuant to Section XV.B.4. This does not apply to any transfers within the estate of Franck Beguiristain.

C. OFFERINGS BY FRANCHISEE. Public or private offerings are subject to prior written consent and each proposed offering will require a fee from the Company limited to the costs associated with the investigation of the particulars of the offering.

D. RIGHT OF REFUSAL. Franchisor's Right of First is limited to any majority transfer of interest.

## XV. DEFAULT AND TERMINATION.

All instances of Curable Default shall have a minimum of thirty (30) days notice and opportunity to cure. Also the period shall be extended in the event the circumstances of default cannot be readily cured within said thirty (30) days, the time period to cure shall be automatically extended in the event the efforts to cure are undertaken within said thirty days and are continuing.

A. Franchisee will be considered in default under this Agreement if in involuntary bankruptcy that is not dismissed within one hundred eighty (180) days.
B.        4. Change any "attempt to transfer" to be any "actual transfer of majority interest".
5. Franchisee shall have the opportunity to cure within thirty (30) days to obtain written covenants from employees for non-disclosure and non-compete.
C. Delete "unless a shorter period is provided".

## XVII. COVENANTS

C. Covenant not to compete is limited to any restaurant or business where chicken is 51% or more is chicken.
H. The obligation to pay Franchisor's attorneys' fees is modified to provide for payment to prevailing party.

## XVII. TAXES, PERMITS, ETC.

CHICKEN KITCHEN FRANCHISE AGREEMENT

D. Franchisee is obligated to notify Franchisor of any legal proceeding within five (5) days of any proceeding that will have a material adverse effect on the Franchisee or Franchisor business.

XX. APPROVALS AND WAIVERS

A. Franchisor's approvals shall not be unreasonably denied nor delayed in any instance where required.

FRANCHISOR:
ROYAL OAK CAPITAL LLC

By: _____

Christian De Berdouaré, President

FRANCHISEE:
Manresa Corporation

By: _____

Frank Beguiristain

FROM :CHICKEN KITCHEN          FAX NO. :305-892-7887          Mar. 02 2006 01:30PM  P2

# FRANCHISE AGREEMENT ASSIGNMENT

ASSIGNMENT OF FRANCHISE AGREEMENT made on the 18th of April 2002 by Royal Oak Capital, LLC, ("Assignor") to Chicken Kitchen USA, LLC, ("Assignee").

NOW, THEREFORE, in consideration of the sum of one dollar and other good and valuable consideration the parties have agreed as follows:

1. Assignment of Franchise Agreement.  Assignor hereby assigns to Assignee, all of Assignor's right, title and interest in and with respect to the Franchise Agreement, dated January 30, 2002, by and between Royal Oak Capital, LLC and Manresa Corporation.

2. Assumption of Franchise Agreement.  Assignee hereby assumes the performance of all of the terms, covenants and conditions required on the part of the Franchisor pursuant to the provisions of the Franchise Agreement.

IN WITNESS WHEREOF, the parties have executed this Assignment on the date first above written.

ASSIGNOR:
Royal Oak Capital, LLC

By:_____
          Managing Member

ASSIGNEE:
Chicken Kitchen USA, LLC

By:_____
          Managing Member

**EXHIBIT "B"**



**BY FEDERAL EXPRESS, HAND DELIVERY & ELECTRONIC MAIL**

November 21, 2005

Manresa Corporation
Attn. Mr. Frank Beguiristan
100 Edgewater Drive, #105
Coral Gables, FL 33133

Manresa Corporation
Keystone Plaza
13507 Biscayne Blvd.
North Miami, FL 33181

**Re:** Chicken Kitchen Franchise Agreement dated January 30, 2002 between Manresa Corporation, as Franchisee and Royal Oak Capital, LLC, as Franchisor, assigned to Chicken Kitchen USA, LLC

Dear Sir,

Please take notice that you are currently in default of the above referenced Franchise Agreement for the sums of $21,900.24 for royalty fees, $7,797.63 for National Advertising Fees and $18,378.68 for Regional Cooperative marketing fees aggregating $48,076.55, bearing interest as of 30 days after non-payment pursuant to Article IVF. of the rider to your Franchise Agreement.

Moreover you are in default of your obligations set forth in the Franchise Agreement to operate your business with appropriate quality, service and cleanliness. Our files are replete with consumer complaints and your continued refusal to cure your previous cleanliness and service defaults. Your lack of competent management and refusal to cooperate in the most minimal manner supports the reality that you should no longer be a Chicken Kitchen Franchisee.

Pursuant to the Franchise Agreement, Article XV. you have ten days to cure all financial defaults and inasmuch as your continued operational default threaten public health and safety, you have ten days to cure same.

If you do not cure these defaults in the ten day period after receipt of this notice, we hereby demand that you comply with Article XVI. of the Franchise Agreement by assigning to our designee your lease for your store premises.

**EXHIBIT "C"**

If you ignore this letter and do not cure these defaults, you will be in violation of the Lanham Act and the next communication you will receive will be an injunction restraining your use of the Chicken Kitchen trademarks as well as termination of your Franchise Agreement as well as charges for all legal fees incurred, plus interest.

Yours truly,

Christian de Berdouaré
President & CEO


cc: Andrew Boros, Esq.

**BY FEDERAL EXPRESS, HAND DELIVERY & ELECTRONIC MAIL**

January 9, 2006

Manresa Corporation
Attn. Mr. Frank Beguiristan
100 Edgewater Drive, #105
Coral Gables, FL 33133

Manresa Corporation
Keystone Plaza
13507 Biscayne Blvd.
North Miami, FL 33181

**RE:** Chicken Kitchen Franchise Agreement dated January 30, 2002 between Manresa Corporation, as Franchisee and Royal Oak Capital, LLC, as Franchisor, assigned to Chicken Kitchen USA, LLC

Dear Sirs,

On November 21, 2005 we sent by (i) e-mail; (ii) Federal Express to your store address and (iii) to Frank Beguiristain at his home address notices of default with a subsequent email modification granting you a 30-day period to cure such defaults.

You have failed to cure the defaults set forth in the above-described notices and accordingly please take notice that the above referenced Franchise Agreement is hereby cancelled and terminated as of the date hereof. The $2,000 check sent to us by your attorney Aurbrey Rudd, Esq. has been credited to your indebtedness.

Article XVI of the above referenced Franchise Agreement establishes our respected obligations upon termination as set forth below:

*"XVI. OBLIGATIONS UPON TERMINATION OR EXPIRATION*

*Upon termination or expiration of this Agreement, all rights granted to Franchisee shall terminate and:*

*A.      Franchisee shall immediately cease to operate the Franchise Business, and shall not thereafter, directly or indirectly, represent to the public that the restaurant is associated with the Chicken Kitchen System or hold himself out as a present or former franchisee of Franchisor.*

*B.      Franchisee shall immediately and permanently cease to use, in any manner, any menus, recipes, confidential methods, procedures and techniques associated with the Chicken Kitchen System and the Proprietary Marks.  In particular, Franchisee shall cease to use, without limitation, the proprietary marinated chicken or marinade mix, and all signs, advertising materials, displays, stationery,*

**EXHIBIT "D"**

*forms and any other materials which display any of the Proprietary Marks; provided, however, that this Section XV.B. shall not apply to the operation by Franchisee of any other restaurant under the Chicken Kitchen System pursuant to a franchise granted by Franchisor to Franchisee.*

*E.       Franchisee shall take appropriate action to cancel any assumed or fictitious name registration, which contains any of the Proprietary Marks, and Franchisee shall furnish Franchisor with evidence of compliance within 30 days after termination or expiration of this Agreement.*

*F.       Franchisee shall, at Franchisor's option, assign to Franchisor or its designee Franchisee's interest in any lease or sublease for the premises of the Franchise Business.  If Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Franchise Business, Franchisee shall promptly after termination or expiration of this Agreement, make such modifications or alterations to the premises as may be necessary to distinguish the appearance of the premises from its former appearance and that of other restaurants operating under the Chicken Kitchen System.  If Franchisee fails or refuses to comply with the requirements of this Section XVI, Franchisor may enter upon the premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made the required changes, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.*

*G.       Franchisee agrees, in the event it continues to operate or subsequently begins to operate a restaurant or other business, not to use any reproduction, counterfeit, copy, or colorable imitation of any of the Proprietary Marks in connection with the operation of, or promotion of, such restaurant or other business which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any trade dress designation of origin, description or representation which falsely suggests or represents an association or connection with Franchisor or the Chicken Kitchen System.*

*H.       Franchisee shall immediately pay all sums owing to Franchisor and its subsidiaries and affiliates.  In the event of termination because of a default by Franchisee, these sums shall include all damages, costs and expenses, including reasonable attorneys fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against all personal property, furnishings, equipment, signs, fixtures and inventory owned by Franchisee located on the premises of the Franchise Business at the time of default.*

*I.       Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees incurred by Franchisor subsequent to the*

*termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provision of this Section XVI.*

*J.        Franchisee shall immediately deliver to Franchisor the MOP and such their records, files, instructions, correspondence and materials, which are confidential and are related to operating the Franchise Business and/or to the Chicken Kitchen System.*

*K.        Franchisor shall have the option, exercisable within 30 days after termination or expiration, to purchase from Franchisee the furnishings, equipment, signs, fixtures, supplies, inventory and other tangible assets of the Franchise Business at fair market value. If the parties are unable to agree on the fair market value within a reasonable time, an independent appraiser shall be designated by Franchisor, which appraiser's determination shall be binding. Franchisor shall receive a credit against the purchase price for any sums, which are owed to it or a subsidiary or affiliate by Franchisee, the cost of the appraisal, if any, and for any monies, which Franchisor expends for obligations of Franchisee. Upon payment of the purchase price, Franchisee shall deliver to Franchisor or its designee a bill of sale conveying title to the property free and clear of all encumbrances, and such other documents reasonably required to effect a complete transfer of Franchisee's right, title, and interest in the assets. Franchisee shall ensure that notice is given to all creditors pursuant to the applicable bulk transfer laws of the state where the Franchise Business was located, and shall hold Franchisor harmless from any and all claims of Franchisee's creditors.*

*L.        If Franchisee occupies the premises as a fee owner, Franchisee shall give Franchisor the option of buying or leasing the premises at its fair market value. In the event that Franchisor chooses to lease the premises, the term of the lease shall be for a period of 20 years.*

*M.        Franchisee shall comply with the covenants contained in Section XVII.C.*

Pursuant to paragraph F. above, Franchisor hereby elects to receive by its designee an assignment of your store lease and the right to purchase all of your equipment and items of personal property used in the operation of your former Chicken Kitchen business.

Accordingly, we hereby demand that you immediately cease operations of your Chicken Kitchen restaurant and cease and desist in the use of the Chicken Kitchen brand, trademarks, supply systems, proprietary products and comply with all of the provisions of the above referenced Franchise Agreement that arise upon termination.

We have retained counsel and will be commencing a legal proceeding to enjoin your Chicken Kitchen operation.

Very truly yours,

Christian de Berdouaré
President & CEO
CHICKEN KITCHEN USA, LLC

Cc: Aubrey G. Rudd Esq.
  Peter Russin Esq.
  David Siegel Esq.



January 9, 2006

Aurbrey G. Rudd, Esq.
7901 S.W. 67 Avenue
South Miami, FL 33143

**By Electronic Mail and Telefax**

Dear Mr. Rudd,

We are in receipt of your letter of December 20, 2005 regarding your client, Manresa Corporation.

We enclose for your files a copy of our termination notice sent to your client this day by Federal Express and Electronic Mail.

In response to the allegations set forth in your letter, we think it only appropriate that we respond accordingly as your client has seriously misinformed you of the relevant facts;

1)      Any allegations regarding to undisclosed rebates are incorrect. Your client has the absolute right to purchase any of his raw materials from suppliers of his choice, subject to the Franchisor's consent.

2)      Article XXIII (I) of the Franchise Agreement provides in part as follows; "all claims arising out of this agreement... must be made within one (1) year from the occurrence of the facts giving rights to the claim." Therefore, with respect to any claims of your client, the only valid ones would be for a one (1) year period ending on January 29, 2006. Arguendo, even if your claims were to be correct, the extent of your client's damages is insignificant in relationship to the total financial obligations due to us, which totals a sum in excess of $58,000 less the $2,000 paid pursuant to your letter. The appropriate behavior of your client should be to stay current and in compliance of his Franchise Agreement, including the payment of all his arrearages and litigate any claims pursuant to his terms.

3)      With respect to advertising and NAF collections, all payments are collected by the Franchisor pursuant to the Franchise Agreement and deposited into the CK South Florida Marketing Fund account and the Chicken Kitchen NAF account, both at the Bank of America and these records are available for your inspection at any time, with prior notice.

4)      We realize that you have been hired to protect your client, however, any attempt to defend the quality of your client's operations will be an embarrassment to you. Your client's restaurant is operated in a revolting, unprofessional manner, characterized by the lack of cleanliness, inadequate and unfriendly service with sub-standard Chicken Kitchen authorized products. Your client is an absentee owner-operator who has left control of his business to third parties who are destroying it along with our brand. We have faxed to you a small sample of customer complaints and some correspondence to confirm our claims.

5)      Pursuant to today's telephone conversation with my attorney, David Siegel Esq., you have informed us of a prospective purchaser of your client's franchise and your client's willingness to pay a portion of his indebtedness in order to obtain our cooperation. Accordingly, provided that your client promptly pays 50% of the current outstanding royalty indebtedness, which is $27,915.44, we will not enforce the termination notices for a reasonable time and cooperate with respect to the proposed sale of the business. In addition, your client must remain current for all future weeks, pending the sale completion. If the sale does not occur, whatever your client has paid will be credited to his account and then we will either terminate or your client will somehow obtain our default waiver and cure all arrearages.

6)      If your client cures all the defaults and the sale does not occur, there must be a resolution of the inadequate operations and absentee management must cease.

7)      With respect to the proposed sale, you have advised us that the lead buyer is Emilio Mena. We have obtained his email address and will be emailing him today our latest UFOC along with the current Franchise Agreement that must be executed in the event of sale. As per your discussion with Mr. Siegel, the Franchisor is also entitled to the Right of First Refusal, and as you know the Franchise Agreement provides that the Franchisor's consent is conditional of the curing of all defaults by the Franchisee. We suggest that you provide the proposed offer to us so we can either accept or reject before you go to the trouble of preparing the closing papers. Please note that the closing will be subject to the terms of our current UFOC which must be complied with by the purchaser.

8)      We will forward to you our correspondence with Mr. Mena, and I will be processing him immediately to facilitate the sale.

9)      If your client refuses to pay the partial cure as set forth in paragraph 4 above, we will not cooperate with him in any manner and we expect him to cease operations of his Chicken Kitchen restaurant operations.

Please feel free to contact me or my attorney David Siegel (305.753.2564) at any time.

Very truly yours,

Christian de Berdouaré
President & CEO
CHICKEN KITCHEN USA, LLC

Cc:  Peter Russin Esq.
       David Siegel Esq.

✎ AO 120 (Rev. 2/99)

| COMMISSIONER OF PATENTS & TRADEMARKS<br>2121 CRYSTAL DRIVE<br>SUITE 1100<br>ARLINGTON, VA 22201 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|

In Compliance with 35 § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _____ Southern District of Florida _____ on the following ☐ Patents or   X  Trademarks:

| DOCKET NO.<br>06-20592-CV-Ungaro-Benages | DATE FILED<br>March 9, 2006 | U.S. DISTRICT COURT<br>Southern District of Florida |
|---|---|---|
| PLAINTIFF<br>Chicken Kitchen USA, LLC | | DEFENDANT<br>Manresa Corporation, et al. |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1   (see attached) | (see attached) | (see attached) |
| 2 | | |
| 3 | | . |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading | |
|---|---|---|
| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | |
| 2 | | |
| 3 | | . |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK<br>CLARENCE MADDOX | (BY) DEPUTY CLERK<br>Warren Condon | DATE<br>3/10/06 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Commissioner   Copy 3—Upon termination of action, mail this copy to Commissioner**
**Copy 2—Upon filing document adding patent(s), mail this copy to Commissioner   Copy 4—Case file copy**

**06-20592**

**CIVIL COVER SHEET**

JS 44 (Rev. 11/05)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**CIV-UNGARO-BENAGES**

**MAGISTRATE JUDGE O'SULLIVAN**

**I. (a) PLAINTIFFS**
Chichen Kitchen USA, LLC, a Florida limited liability company,

**DEFENDANTS**
Manresa Corporation, a Florida corporation and Frank Beguiristain

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Miami-Dade County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Peter D. Russin, Esq. and Daniel N. Gonzalez, Esq.
Meland Russin & Budwick, P.A.
200 S. Biscayne Blvd., Suite 3000, Miami, FL 33131
Phone: 305-358-6363 Fax: 305-358-1221

Attorneys (If Known)
Aubrey Rudd, Esquire, 7901 SW 67 Avenue, Suite 206
South Miami, FL 33143, Phone: 305-740-7472

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

TORTS
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☒ 840 Trademark

SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☐ YES ☑ NO
b) Related Cases ☐ YES ☑ NO
JUDGE                    DOCKET NUMBER

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sects. 1114 and 1125. Defendants are in breach of a franchise and trademark agreement.
LENGTH OF TRIAL via 2 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ (in excess of 250,000)
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD
DATE  March 9, 2006

FOR OFFICE USE ONLY
AMOUNT $250.00  RECEIPT # 936491  IFP
03/09/06

JS 44 Reverse  (Rev. 11/05)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

(d) Choose one County where Action Arose.

**II.     Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than **one basis** of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.**  *This section of the JS 44 is to be completed if diversity of citizenship was indicated above.*  Mark this section for each principal party.

**IV.     Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled Copy of Order of Dismissal.  (3)

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**VII.     Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: <u>47 USC 553</u>
                                                                                     Brief Description: <u>Unauthorized reception of cable service</u>

**VIII.     Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.